UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

------------------------------------------------------------- x

PENGUIN RANDOM HOUSE LLC; SIMON &
SCHUSTER, INC.; ALAN U. SCHWARTZ, as
trustee of THE TRUMAN CAPOTE LITERARY
TRUST; JOHN SAMPAS as Literary
Representative of THE ESTATE OF JACK
KEROUAC; NANCY BUMP; ANTHONY M.
SAMPAS; JOHN LASH, Executor of THE
ESTATE OF JAN KEROUAC; THE DR.
ARTHUR C. CLARKE TRUST; HEMINGWAY
COPYRIGHTS, L.L.C.; THE PATRICK
HEMINGWAY AND CAROL T. HEMINGWAY
REVOCABLE LIVING TRUST; and THE
HEMINGWAY FAMILY TRUST,

              Plaintiffs,

   -  against -

FREDERIK COLTING and MELISSA MEDINA,
d/b/a Moppet Books,

             Defendants.

------------------------------------------------------------- x

17 Civ. 386 (      )


**COMPLAINT**

     Plaintiffs Penguin Random House LLC ("PRH"); the Dr. Arthur C. Clarke Trust; Alan U.

Schwartz as trustee of the Truman Capote Literary Trust; John Sampas as Literary

Representative of the Estate of Jack Kerouac, Nancy Bump, Anthony M. Sampas, and John

Lash, Executor of the Estate of Jan Kerouac (the "On the Road" Plaintiffs) (collectively with

PRH, the "PRH Plaintiffs"); and Simon & Schuster, Inc. ("S&S") and Hemingway Copyrights,

L.L.C., The Patrick Hemingway and Carol T. Hemingway Revocable Living Trust; and The

Hemingway Family Trust (collectively, the "Old Man and the Sea Plaintiffs," and together with

S&S, the "Hemingway Plaintiffs"); as and for their Complaint against the defendants Frederik

Colting ("Colting") and Melissa Medina ("Medina"), doing business as Moppet Books, allege as

follows:

## **NATURE OF THE ACTION**

1.     This is an action for willful copyright infringement of four acclaimed, copyrighted novels—namely *Breakfast at Tiffany's*, *The Old Man And The Sea*, *On The Road*, and *2001: A Space Odyssey* (the "Novels")—the respective copyright interests in which are held by plaintiffs. As defendants freely acknowledge, the Novels are some of our "greatest literary works," "our most beloved classics," and gave us "the stories and characters that shaped our culture."

2.     Seeking to capitalize on the Novels' enduring fame and popularity, defendants have reproduced, distributed and advertised what they call "children's versions" of these Novels (the "Infringing Works"), offered for sale, *inter alia*, on defendants' website, https://www.kinderguides.com/pages/about-us (the "KinderGuide Website") and *via* third-party retailers, including Barnes & Noble, Amazon and Books-A-Million.

3.     Each infringing title is nothing other than an unauthorized derivative work, taking its plot, settings, themes, sequence of events, and principal characters from each of the Novels wholesale, repackaging these copyrightable elements in condensed, abridged and illustrated form, and doing nothing whatsoever to transform, comment upon, or criticize them.   The Infringing Works simply re-tell the critical plot elements of each of the four highly-acclaimed, copyrighted Novels in language addressed to children.

4.     Defendants group all four Infringing Works under a series they call "KinderGuides"—a transparent attempt to recast their unauthorized derivatives as "study guides" intended for the elementary school set.   Quick review readily reveals that the Infringing Works do not even purport to be companion guides or reference books intended for use by readers of the Novels because, as defendants also admit in their marketing materials, the Novels address adult themes and concepts.

5.      That defendants' actions are willful cannot be seriously questioned given the prior conduct of defendant Colting.  Mr. Colting was the author of the infamous and ill-fated "sequel" to J.D. Salinger's *Catcher in the Rye*.  He was enjoined by this Court from publishing that book and his cry of fair use—which he will no doubt raise yet again—was soundly rejected.  Now operating under the name Moppet Books, Colting once again proceeds to brazenly infringe the rights of different authors, and the author's heirs and publishers, in complete disregard of copyright law.  Remarkably, he also has the temerity to claim on the KinderGuide Website that an upcoming title is none other than "*Catcher in the Rye*".

6.      If defendants truly wish to introduce young children to the classics, there are literally thousands of public domain works from which they could choose.  Yet, none of their first four titles are drawn from the public domain, nor are their upcoming titles *Catcher in the Rye*, *To Kill a Mockingbird*, and *The Alchemist*.  Defendants have chosen, instead, to trade upon the current appeal of the Novels, each of which is fully protected by valid and subsisting copyrights in the United States.  They have done so purely for their own purposes, agenda and profit, at the expense of plaintiffs, and in complete disregard of copyright law.

7.      Plaintiffs own and control the copyright in each Novel and have the exclusive right to determine which potential markets and particular audiences to market the Novels to, in accord with their own strategic assessments and judgments about the spirit and editorial integrity of each work. None of the authors of these Novels, nor their heirs or publishers, has authorized children's versions of any of the Novels.  The injury caused by defendants' infringement is not purely monetary, as it also impacts the reputation of the Novels, their authors and, by extension, the plaintiff heirs and publishers.  Reviewers of the Infringing Works for *The New York Times*, *Forbes*, *The Guardian* and *The Chicago Tribune* have roundly criticized defendants' expurgated editions of the Novels.

8.      Plaintiffs PRH and S&S join in this suit to stand with the authors and their heirs to protect the authors' reputations and the spirit and integrity of their Novels, to defend plaintiffs' respective rights to control how each of the Novels is presented to the reading public, in what form, when, and to what audience, and to prevent the Infringing Works from irreparably injuring their exclusive publishing rights.

9.      Plaintiffs seek a judgment and order from this Court finding that each of the subject KinderGuides infringes the copyright in the corresponding Novel and the relevant plaintiffs' exclusive right to create works derivative thereof, and preliminarily and permanently enjoining defendants from reproducing, publishing, distributing, advertising or otherwise disseminating the Infringing Works.

## JURISDICTION AND VENUE

10.      This action arises under and pursuant to the Copyright Act of 1976, as amended, 17 U.S.C. §101 *et. seq.*

11.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 because it arises under the copyright laws of the United States.

12.      Venue in this action lies in the Southern District of New York pursuant to 28 U.S.C. §§ 1391(b), (c) and (d).

13.      This Court has personal jurisdiction over defendants pursuant to Fed. R. Civ. P. Rule 4(k)(1)(a) because defendants have committed the tort of copyright infringement in this State and the claims for relief set forth herein arise out of tortious acts whether within or without this State, causing injury or property damage to parties within New York; defendants should have reasonably expected their tortious acts to have consequences in this State since KinderGuides are available for purchase in New York, have in fact been purchased by people in this State, and, if not enjoined, will continue to be purchased by New York residents; the

Infringing Works have been misleadingly and deceptively advertised and promoted in New York; and because, on information and belief, defendants derive substantial revenue from interstate commerce.

## THE PARTIES

### The Hemingway Plaintiffs

14.     Plaintiff Hemingway Copyrights, L.L.C. is a limited liability corporation formed and existing under the laws of the State of Florida, with its principal place of business at 5580 Lagorce Drive, Miami Beach, Florida 33140.

15.     Plaintiff the Patrick Hemingway and Carol T. Hemingway Revocable Living Trust is a revocable Trust formed and existing under the laws of the State of Montana for the benefit of Patrick Hemingway, Carol T. Hemingway and their heirs.

16.     Plaintiff The Hemingway Family Trust is a revocable Trust formed and existing under the laws of the State of Washington for the benefit of Angela Hemingway and her heirs.

17.     Collectively, Hemingway Copyrights, L.L.C., the Patrick Hemingway and Carol T. Hemingway Revocable Living Trust and The Hemingway Family Trust are the successors-in-interest to Ernest Hemingway's U.S. copyright interests.

18.     Plaintiff S&S is a corporation organized and existing under the laws of the State of New York**,** with its principal place of business at 1230 Avenue of the Americas, New York, New York 10020.  S&S is the successor-in-interest to the Scribner Book Companies, Inc. It is the publisher of and holds the exclusive English language publishing license for Ernest Hemingway's *The Old Man and the Sea* within the United States, including the right to publish or license *The Old Man and the Sea* for publication in the form of abridgements and condensations.

**The PRH Plaintiffs**

19.     Plaintiff The Dr. Arthur C. Clarke Trust is the successor-in-interest to Arthur C. Clarke, the acclaimed author of the novel *2001: A Space Odyssey* and numerous other works of science fiction.

20.     Plaintiff The Arthur C. Clarke Trust is a co-owner of the copyright in the novel *2001: A Space Odyssey*.

21.     Plaintiffs John Sampas, Literary Representative of the Estate of Jack Kerouac, John Lash, Executor of the Estate of Jan Kerouac, Nancy Bump, and Anthony M. Sampas are the successors-in-interest to Jack Kerouac and hold the copyright in the novel *On the Road*.

22.     Plaintiff The Truman Capote Literary Trust is the successor-in-interest to Truman Capote and holds the copyright in *Breakfast at Tiffany's*.

23.     Plaintiff PRH is a limited liability corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1745 Broadway, New York, New York 10019.  It is the publisher and holds the exclusive license to publish in the United States each of the novels *Breakfast at Tiffany's*, *2001: A Space Odyssey*, and *On the Road*.  PRH also holds the exclusive right to publish these novels in the United States in condensed or abridged form.

**Defendants**

24.     Defendant Colting is a citizen of Sweden and, upon information and belief, resides and/or works at 2624 Berkeley Avenue, Los Angeles, California 90026.  He is the Founder and CEO of Moppet Books and, together with defendant Medina, purports to be an author and/or publisher of each of the KinderGuides.

25.     Defendant Medina, upon information and belief, resides and/or works at 2624 Berkeley Avenue, Los Angeles, California 90026.  She is the Creative Director and Co-Founder of Moppet Books and purports to be an author and/or publisher of the KinderGuides.

26.     Defendants Colting and Medina are doing business under the name Moppet Books, which lists as its address 2624 Berkeley Avenue, Los Angeles, California 90026. Under the Moppet Books name, Colting and Medina are publishing and offering for sale the unauthorized derivatives as part of a supposed line of books under the "KinderGuides" name via the KinderGuide Website and other retailers.

## FACTUAL BACKGROUND

### *The Old Man and the Sea*

27.     *The Old Man and the Sea* is one of Ernest Hemingway's most enduring works. Told in language of great simplicity and power, it is the story of an old Cuban fisherman, down on his luck, and his supreme ordeal—a relentless, agonizing battle with a giant marlin far out in the Gulf Stream.  Hemingway recasts, in strikingly contemporary style, the classic themes of courage in the face of defeat, personal triumph won from loss, the power of faith, and brotherhood with nature.

28.     First published in 1952 to instant bestseller status, this immensely-successful novella remained on the best seller list for six months.  In addition to its immense popularity, *The Old Man and the Sea* achieved tremendous critical acclaim.  In May 1953, the novel was awarded the Pulitzer Prize for fiction.  *The Old Man and the Sea* was also specifically highlighted by the Nobel Prize Committee in awarding the Nobel Prize in Literature to Hemingway in 1954.  Since its release, it has been translated into 26 languages.

29.     *The Old Man and the Sea* has received extraordinary critical praise.  In its August 28, 1952 review, *The New York Times* described Hemingway as writing with "sure skill.  Here is

the master technician once more at the top of his form, doing superbly what he can do better than anyone else."  Similarly, William Faulkner called *Old Man and the Sea* "[Hemingway's] best. Time may show it to be the best single piece of any of us, I mean his and my contemporaries."

30.     *The Old Man and the Sea* remains a critical and commercial success today, selling more than 200,000 copies each year.  In 1998, the Radcliffe Publishing Course named *The Old Man and the Sea* the 32nd greatest novel of the century.  It has been a perennial presence on high school required reading lists across the United States for over 50 years.  S&S distributes the novel to *inter alia*, school and library markets, to meet this continuing demand.

31.     Although the language of *The Old Man and the Sea* is clear and deceptively simplistic, the story itself is not.  In describing it to his publisher, Ernest Hemingway is famously quoted as saying that he had just finished a short novel that was "[t]he best I can write ever for all of my life."  Consistent with Ernest Hemingway's wishes, the Hemingway Plaintiffs do not permit any modifications of the language of Hemingway's finished stories, including *The Old Man and the Sea*.

32.     As the author did before them, the Hemingway Plaintiffs have consistently rejected requests for permissions to produce abridged, condensed, and/or children's or young readers' versions of *The Old Man and the Sea*.  They have not authorized any text-based or book-based derivative works based on the novel.

33.     Ernest Hemingway was also vocal about his dislike of illustrated editions of his works.  For this reason, the Hemingway Plaintiffs have also rejected requests to create illustrated versions of *The Old Man and the Sea*.

34.     The Hemingway Plaintiffs have licensed several adaptations for film and television, including a 20-minute-long animated film by Alexander Petrov, which won an Academy Award for the best Animated Short Film in 1999.

35.     Although the Hemingway Plaintiffs do, on occasion, license the name and likeness of Ernest Hemingway himself, they have never licensed products deriving from the books or the storylines or characters in them.

36.     On or about August 28, 1952, *The Old Man and the Sea* was duly registered for copyright protection in the United States Copyright Office in the name of Ernest Hemingway. That Registration bore No. B500000021683/1952-08-28.

37.     In or around January 22, 1980, the copyright in *The Old Man and the Sea* was duly renewed.  A copy of that renewal bearing number RE0000052130/1980-01-22 is annexed hereto as **Exhibit A**.

38.     Following Hemingway's death in 1961, his interest in the copyright passed to his wife, Mary Hemingway.  Upon Mary Hemingway's death, the copyright interest passed to Hemingway's children and, in turn, to their heirs.  The Old Man and the Sea Plaintiffs are entities and trusts owned and/or controlled by Ernest Hemingway's children and grandchildren.

39.     *The Old Man and the Sea* is subject to valid and subsisting copyright protection under the laws of the United States and all formalities thereunder have been duly complied with.

### ***Breakfast at Tiffany's***

40.     *Breakfast at Tiffany's* is the acclaimed novella written by Truman Capote and first published as part of a collected work titled *Breakfast at Tiffany's. A Short Novel and Three Stories*.  In addition to *Breakfast at Tiffany's*, the book included Capote's stories *House of Flowers*, *A Diamond Guitar*, and *A Christmas Memory*.

41.     Set in the 1940s, *Breakfast at Tiffany's* tells the story of Holly Golightly (christened Lulamae), who has escaped her life as a country girl married to a rural Texas veterinarian.  In the novel, she has reinvented herself as a New York City café society girl and lives by socializing with wealthy men who give her money and gifts.  The story is told from the

perspective of a narrator who meets Holly Golightly largely by chance and recounts their interactions and conversations over a period of months.  At the end of the novel, Holly flees New York City for Brazil, escaping allegations that implicate her in the criminal acts of one of her "gentlemen friends."

42.     The protagonist of *Breakfast at Tiffany's*, Holly Golightly, has been referred to as "one of the great heroines of modern literature."  Having abandoned Texas, "Doc" (the man she married at age 14) and her former identity, she refuses to be tamed or tied down.  Rather than an address, as would be customary, her card states: "Miss Holly Golightly, *Traveling*."  She refuses to name her cat—instead calling him just "Cat"—because this would mean she "owns" and is therefore responsible for him.  She speaks affectionately of her brother Fred, but has not gone back to see him since she left Texas, and refuses Doc's entreaties to come home.

43.     Whenever Holly gets what she calls "the mean reds"—a feeling she describes as "being afraid … but you don't know what you're afraid of"—she heads to Tiffany & Co. to look at the jewelry.

44.     Holly Golightly does not hesitate to share her views or the details of her life with the narrator, even though she sometimes comes across as outrageous or outspoken.  Holly makes no secret of the fact that she makes a living by socializing with men, regaling the narrator with stories about them—such as her Thursday visits to SingSing to visit the notorious mobster Salvatore ("Sally") Tomato.  She also invites him to a party where he meets others who move in Holly's world, including the millionaire Rusty Trawler; Mag Wildwood, a model who is more than six feet tall; and a Hollywood producer who wants to make Holly famous.

45.     A free spirit, Holly Golightly does not take herself or life too seriously.  She does not hesitate to engage in crazy antics, such as climbing into stranger's apartments through the window and stealing animal masks so that she and narrator can wear them as they walk around

New York City.  After she washes her hair, Holly likes to sit out on the fire escape with Cat and play her guitar, sometimes singing along.

46.    As *The Telegraph* explained in a 2013 article highlighting the enduring allure and fame of the character:

> [S]he's a great original.  Of all his characters, Capote said, Holly was his favourite, and she has become an icon of American womanhood in the years since he created her.  …
>
> Holly came to represent the epitome of midcentury New York sophistication, a free spirit with chic style, endearing eccentricity, and easy virtue.

47.    *Breakfast at Tiffany's* became an instant bestseller and received glowing reviews from many critics.  Norman Mailer is frequently quoted as saying, in his review of the book, that:

> [Capote] is the most perfect writer of my generation, he writes the best sentences word for word, rhythm upon rhythm.  I would not have changed two words in *Breakfast at Tiffany's* which will become a small classic.

Even now—more than 50 years post-publication—tens of thousands of copies of the novella are purchased each year.

48.    On its face, *Breakfast at Tiffany's* is patently inappropriate for young audiences.  As one reviewer explains, Holly Golightly "spends her days sleeping and her nights at glamorous nightspots in the company of men, some of whom give her money. …   Holly's mercenary attitude towards the opposite sex is no small part of her mystique, titillating some readers and shocking others."  Sexual themes are prevalent throughout the novel, which leaves open the question of whether Holly Golightly should be considered a prostitute.  In this respect, *Breakfast at Tiffany's* stands in stark contrast to *A Christmas Memory*—one of the other short stories originally included in the same volume of stories—which is, in the judgment of the Capote

Plaintiffs appropriate for a younger audience.  An authorized, illustrated and unabridged version of *A Christmas Memory*, intended for younger audiences, was published in 1989.

49.     *Breakfast at Tiffany's* was licensed for adaptation into a major motion picture, as well as two plays.  The Truman Capote Literary Trust has not licensed any abridged or condensed versions of *Breakfast at Tiffany's*, including any adaptations for children or young readers, nor has it ever licensed any derivative works based on any of the characters in *Breakfast at Tiffany's*, including Holly Golightly.

50.     On or about October 14, 1958, *Breakfast at Tiffany's* was duly registered for copyright protection in the United States Copyright Office in the name of Truman Capote.  That Registration bore No. A00000358806/1958-10-14.

51.     In or around April 18, 1986, the copyright in *Breakfast at Tiffany's* was duly renewed.  A copy of that renewal bearing number RE000000291743/1980-01-22 is annexed hereto as **Exhibit B**.

52.     Truman Capote passed away in 1984.  Under the terms of Capote's will, his partner Jack Dunphy was provided with an annuity and, upon Dunphy's death, Capote's copyright interests were to be held in trust.

53.     Since Dunphy's death in 1992, the Truman Capote Literary Trust has been the sole owner of all copyright rights and interest in *Breakfast at Tiffany's*.

54.     *Breakfast at Tiffany's* is subject to valid and subsisting copyright protection under the laws of the United States and all formalities thereunder have been duly complied with.

### *2001: A Space Odyssey*

55.     *2001: A Space Odyssey* is the classic 1968 science fiction novel by Arthur C. Clarke, who has been referred to by *The New York Times* as "the great science fact and fiction writer."  In an unusual sequence of events, the novel was written concurrently with Clarke's

work with Stanley Kubrick on the screenplay for the motion picture of the same name.  The novel launched the already well-known Clarke to international acclaim as what one journalist called the "poet laureate of the Space Age."  The film version of *2001: A Space Odyssey* earned Kubrick and Clarke an Oscar nomination for their screenplay.  Clarke also won the Nebula Award of the Science Fiction Writers of America in 1972, 1974 and 1979, the Hugo Award of the World Science Fiction Convention in 1974 and 1980, and in 1986 became Grand Master of the Science Fiction Writers of America.  He was awarded the CBE (Commander of the Most Excellent Order of the British Empire) in 1989.

56.      Written at the beginning of the "space age," *2001:  A Space Odyssey* explores the themes of evolution; intelligent life on other planets; space travel; and artificial intelligence— more specifically, the potential dangers associated with inventing machines so "intelligent" that humans cannot fully understand or control them.

57.      Beginning with the impact of an alien monolith on human evolution, the novel spans millions of years, through the discovery of a monolith on the moon and a secret mission to study another monolith on one of Saturn's moons, Japetus.  It then tells the story of the two astronauts on the spaceship *Discovery*, which is headed for Saturn and controlled by an allegedly-infallible, artificially-intelligent computer called HAL.  HAL reacts adversely to being asked to keep the purpose of the mission secret from the crew, and begins making mistakes. Ultimately, when the crew threatens to shut HAL down, HAL feels the need to defend himself, as if his life were at stake.  The sole astronaut who survives, Bowman, spends the remainder of the mission alone on the ship.  On arrival, Bowman is sucked into a field of stars.  He sees the birth and destruction of many civilizations, understands the role that the alien forces played in human evolution and is made an immortal Star Child.  At the end of the novel, Bowman returns to our solar system and saves earth from destruction by a nuclear warhead.

58.     Likely one of the most famous and highly-regarded science fiction novels of all time, *2001: A Space Odyssey* achieved critical acclaim and commercial success that was not overshadowed by the film.  As *The New York Times* book review, dated July 5, 1968, noted:

> It is indeed an odyssey, this story, this exhilarating and rather chilling science fiction fantasy.  ….
>
> And, of course, it is a fantasy--you need not believe it--but a fantasy by a master who is as deft at generating accelerating, almost painful suspense as he is knowledgeable and accurate (and fascinating) about the technical and human details of space flight and exploration.  But it is finally the stretching of the imagination that is most enthralling as Mr. Clarke entices the reader into strange and magnificent conceptions of other forms of time, dimension and existence.

Nearly fifty years later, the book's popularity continues among both science fiction enthusiasts and other readers.

59.     On or about February 3, 1969, *2001: A Space Odyssey* was duly registered for copyright protection in the United States Copyright Office in the names of Polaris Productions, Inc. and Arthur C. Clarke.  A copy of the copyright certificate bearing U.S. Reg. No. A0000045151 / 1969-02-03 is annexed hereto as **Exhibit C**.

60.     Pursuant to Public Law 102-307, enacted on June 26, 1992, the copyright in *2001: A Space Odyssey* renewed automatically, by operation of law, at the end of the initial term.

61.     The Dr. Arthur C. Clarke Trust, as successor to Arthur C. Clarke, is a co-owner of the copyright in *2001: A Space Odyssey*.

62.     *2001: A Space Odyssey* is subject to valid and subsisting copyright protection under the laws of the United States and all formalities thereunder have been duly complied with.

### On the Road

63.     *On the Road* is the critically-acclaimed, semi-autobiographical novel written by Jack (John) Kerouac and first published on or around September 5, 1957 by Viking Press.

64.     *On the Road* tells the story of Sal Paradise, a former student at Columbia University who lives just outside New York City and his friendship with Dean Moriarty, a free-spirited adventurer who has just moved to New York with his wife Marylou.  Inspired by Dean's carefree attitude and love of the open road, Sal goes on a series of cross-country road trips.  *On the Road* is widely credited as the book that gave voice to the post-war "beat generation." Simultaneously an account of youthful exuberance (even recklessness) and culture and a story of personal growth and the search for the answers to life's questions, the novel chronicles the experiences of Sal, Dean, Marylou, their friend Carlo Marx, and others they meet on their journeys.

65.     It has been widely-reported that Kerouac typed the original version of what eventually was published as the novel On the Road in only three weeks on a 120-foot-long-scroll.  After Kerouac finished the scroll version at the end of April 1951, he revised and retyped the manuscript and submitted it to publishers for their consideration.  The novel was ultimately published by Viking Press on September 5, 1957.  The novel's relaxed and casual language, which gives the sense of experiencing the events as they happened, with the same energy, is thought to be characteristic of Kerouac's approach to writing (often referred to as spontaneous prose).

66.     *On the Road* quickly became a commercial and critical success, catapulting Kerouac to fame almost overnight.  Together with Grace Metalious's *Peyton Place*, *On the Road* was one of the best-selling novels of 1957.  In its rave review on September 5, 1957, *The New York Times* heralded the novel as "a major novel" with sections "in which the writing is of a beauty almost breathtaking."  The review further stated that:

> "On the Road" is the second novel by Jack Kerouac, and its publication is a historic occasion in so far as the exposure of an authentic work of art is of any great moment in an age in which the

> attention is fragmented and the sensibilities are blunted by the superlatives of fashion (multiplied a millionfold by the speed and pound of communications).
>
> ….
>
> "On the Road" is the most beautifully executed, the clearest and the most important utterance yet made by the generation Kerouac himself named years ago as "beat," and whose principal avatar he is.

67.     *On the Road* has been a tremendous commercial success and continues to inspire others.  Fifty years after it was published, in an article published on August 15, 2007, *The New York Times* commented on the book's enduring relevance and success in the article "*Still Vital, 'On the Road' Turns 50.*"  Contrasting it with *Peyton Place*, the *Times* noted that:

> Both were cultural touchstones: "Peyton Place" as a precursor of the modern soap opera and "On the Road" as a clarion call for the Beat generation and, later, as an underground bible of the 1960s and '70s.  Today "Peyton Place" is mostly regarded as a historical curiosity, but "On the Road," celebrating the 50th anniversary of its publication, still has a vibrant life on college English course syllabuses and high school summer reading lists, and in young travelers' backpacks."

As the article noted, *On the Road* continues to sell an incredible one-hundred-thousand copies per year.

68.     In 1998, the Modern Library Board ranked *On the Road* 55th on its list of the greatest English-language novels of the twentieth century, and its readers voted it the 42nd greatest.  In the same year, the Radcliffe Publishing Course named *On the Road* the 31st greatest novel of the century (followed immediately by *The Old Man and the Sea* at 32nd place).  The novel was chosen by *Time* as one of the 100 best English-language novels from 1923 to 2005 and by *The Guardian* in 2015 as one of the 100 best English language novels of all time.  Customers of New York's famed Strand Bookstore voted *On the Road* one of their favorite books of all time.

69.     *On the Road* has also had an enormous impact on American culture.  It has been cited as inspiration by artists as diverse as Bob Dylan, Jim Morrison and the Beastie Boys, and by poets and writers, including Hunter S. Thompson.  *The Guardian* reported on the novel's tremendous impact in a 2007 article:

> "It changed my life like it changed everyone else's," Dylan would say many years later.  Tom Waits, too, acknowledged its influence, hymning Jack and Neal in a song and calling the Beats "father figures."    At least two great American photographers were influenced by Kerouac: Robert Frank, who became his close friend—Kerouac wrote the introduction to Frank's book, *The Americans*—and Stephen Shore, who set out on an American road trip in the 1970s with Kerouac's book as a guide.  It would be hard to imagine Hunter S. Thompson's road novel *Fear and Loathing in Las Vegas* had *On the Road* not laid down the template; likewise, films such as *Easy Rider*, *Paris*, *Texas*, and even *Thelma and Louise*.

70.     Kerouac first proposed the idea of a film adaptation of *On the Road* in 1957.  It was not until 1990 that Francis Ford Coppola licensed the right to make the derivative work. The authorized film adaptation was released in 2012.

71.     Viking Press released the original scroll version of the novel titled *On the Road: The Original Scroll* (August 16, 2007), corresponding with the 50th anniversary of original publication.  This original version differs from the published Novel in that it is a rougher version, is more sexually explicit, uses the real names of the people involved in the adventure and includes commentary from four Kerouac scholars.

72.     With the exception of the above, neither the author himself nor any of his heirs has authorized any text or book-based derivative works.  They have not granted permission to produce any abridged, condensed or children's/young readers adaptations of *On the Road.*

73.     On its face, *On the Road* is inappropriate for young audiences, as it touches on numerous mature themes, such as drug and alcohol use and abuse, adultery, and strong sexual content.

74.     On or about September 11, 1957, *On the Road* was duly registered for copyright protection in the United States Copyright Office in the name of Jack Kerouac.  That Registration bore U.S. Reg. No. A00000301333 / 1957-09-05.

75.     In or around December 31, 1985, the copyright in *On the Road* was duly renewed in the names of Kerouac's widow, Stella Kerouac, and daughter, Jan Kerouac.  A copy of that renewal bearing number RE0000282968 / 1985-12-31 is annexed hereto as **Exhibit D**.

76.     Following the deaths of Stella and Jan Kerouac, the copyright interest passed to and is held by plaintiffs John Sampas, Literary Representative of the Estate of Jack Kerouac; Nancy Bump, and Anthony M. Sampas (the heirs of Stella Kerouac); and John Lash, as Executor of the Estate of Jan Kerouac.

77.     *On the Road* is subject to valid and subsisting copyright protection under the laws of the United States and all formalities thereunder have been duly complied with.

**Defendants' Unauthorized Children's Versions**

78.     Defendants Colting and Medina first announced their upcoming KinderGuides line of children's books in or around August 2016 and initially announced that the books would be available to ship in October 2016.  That announcement was made on a website maintained by defendants at www.kinderguides.com.  The Infringing Works were also listed at that time as "coming titles" on Amazon.com.

79.     Defendants promoted the upcoming publication of these unauthorized derivatives in several ways including by way of an August 11, 2016 article in *Publisher's Weekly*, and a September 2, 2016 post on *Today.com* authored by defendants' publicist.  As the *Publisher's*

*Weekly* article put it: "KinderGuides translates adult classics for younger readers." Specifically, each KinderGuide takes the entirety of the plot of each of the novels, each of the characters that appears in each Novel, and appends to them some illustrations designed to appeal to young children.

80. The KinderGuides are unauthorized abridgements and adaptations that condense and recast the original Novels into illustrated "children's books" intended for an audience of young children.

81. A detailed comparison of each of the Novels with the corresponding KinderGuide is annexed hereto as Exhibit E and incorporated herein by reference.

82. With respect to *The Old Man and the Sea*, the children's version is nothing more than a watered-down, condensed version of the book, with pictures. It relies on wholesale copying of numerous copyrightable elements, including but not limited to the following:

- **The Plot and Sequence of Events.** Both tell the story of an old Cuban fisherman who has gone eighty-four days without making a catch. His bad luck causes him to lose his young apprentice, Manolin. The bulk of the story focuses on what happens after he heads far out into the Gulf Stream, hoping to change his luck. On the eighty-fifth day, he catches a giant marlin. Alone in his small boat, unable to fasten the line because the giant fish would break it, the old man endures days and nights of physical adventure, hunger and exhaustion, waiting for the marlin to tire. While he waits, he contemplates the magnificence of the marlin and the beauty of days and nights alone on the Gulf Stream. Santiago finally catches the fish and lashes it to the side of his boat only to spend his return voyage fighting off sharks. By the time he reaches the shore, all that remains of the marlin is its head and bones. Despite the loss of his prize catch, Santiago has proven to himself and the village that he is still a good fisherman and wins back his beloved apprentice.

- **The Characters.** Both the Novel and the KinderGuide center around the same protagonist, Santiago, the fisherman, as well as Santiago's young apprentice, Manolin, and the marlin itself. As in the novel, Santiago and Manolin share a close friendship and love to talk about American baseball, particularly the New York Yankees.

- **The Settings.** The settings are identical. Both are set in a fishing village in Cuba, and move between the shore, Santiago's shack, and the Gulf Stream north of Cuba, with the latter occupying most of the book.

- **Pace and Time.** As in the novel, the infringing KinderGuide opens with Santiago's 84th day without a catch, details his trip out into the Gulf Stream on the 85th day, his battle with the marlin over a period of days, and his return home, while the marlin is attacked by sharks. Both works conclude with the villagers admiring the catch, and Manolin resuming his apprenticeship, the morning after Santiago returns from the trip.

- **The themes.** Both works employ the same themes of courage in the face of danger; human endurance or inner strength; brotherhood with nature; the concept of winning the battle but losing the prize; and the concept that a man can be destroyed but not defeated.

83.    The same is true of *Breakfast at Tiffany's*. The KinderGuide children's version again copies numerous copyrightable elements wholesale from the Novel, including but not limited to the following:

- **Plot and Sequence of Events.** The plot closely tracks the Novel, with minor changes to the sequence of events, and features many of the same incidents, which include, but are not limited to, the following:

  o As in the Novel, the narrator first learns of Holly Golightly's existence when he: (i) sees the "Holly Golightly, *Traveling*" card on the mailbox; (ii) has to help her when she gets locked out of the building; and (iii) hears her playing her guitar and singing on the fire escape, while her hair dries.

  o The friendship between Holly and the narrator is solidified when she climbs in his window one night and they talk for hours about Holly's brother, her life socializing with the wealthy, and her weekly visits to the mobster Sally Tomato, until they fall asleep. The next morning, Holly is awakened by nightmare about her brother and runs off, but later apologizes and invites the narrator to a party where he meets Rusty Trawler, Mag Wildwood, and a Hollywood agent.

  o After the narrator finds out that one of his stories has been accepted for publication, the two celebrate by having lunch in Central Park; they see a parade and pretend that the celebration is really for the narrator. The narrator shows Holly an antique bird cage that he likes. They also wear Halloween masks while wandering around the city.

- o  Holly Golightly and the narrator celebrate Christmas together.  Holly gives the narrator a bird cage that he has been admiring, and he gives Holly a St. Christopher's medal from Tiffany's.

- o  An older man named "Doc" comes to New York City in search of Holly Golightly.  It is then that the narrator first learns that Holly's name is Lulamae/Lula Mae and that she had married Doc in Texas, before running away to New York City.

- o  Holly announces that she plans to marry Jose Ybarra-Jaeger and move to Brazil and tries to learn to speak Portuguese.

- o  When Holly and the narrator go horseback riding in Central Park, the narrator's horse gets spooked by some children and gallops off.  The narrator has to be rescued by Holly and a police officer.

- o  Holly is arrested in connection with Sally Tomato's criminal enterprises.  Her name and picture appear in the paper with headlines linking her to the scandal.

- o  The narrator and Cat accompany Holly to the airport to catch her flight to Brazil.  Holly believes that Cat should be free like she is, and tries to release him into the city and drive away.  Holly ultimately has a crisis of conscience, and the narrator agrees to find and care for Cat.

- ▪  **Characters.**  The KinderGuide makes use of the characters from the Novel. In addition to the Novel's protagonist, Holly Golightly, defendants have taken the narrator; Sally Tomato, a mobster whom Holly visits in SingSing every Thursday and who gets Holly into trouble with the law; Rusty Trawler, a millionaire; Mag Wildwood, a fashion model who is more than 6 feet tall; a Hollywood agent who thinks Holly Golightly could be a big star; and Jose Ybarra-Jaeger, a wealthy Brazilian whom Holly Golightly intends to marry.

- ▪  **Settings.**  The KinderGuide takes its settings from the novel, including the apartment building where Holly Golightly and the narrator reside, where Holly Golightly forgets her keys, climbs through the narrator's window, hosts a party and celebrates Christmas with the narrator, as well as other settings around New York City.

- ▪  **Themes.**  The KinderGuide adaptation employs the same principle theme as the novel:  the struggle between conflicting needs for stability and freedom. This theme is encapsulated through the use of many symbols taken directly from the novel, such as Holly's card ("Holly Golightly, *Traveling*"), her refusal to name her cat, her re-invention of herself in New York City and flight from New York to Brazil when things again become difficult.  This is contrasted with the narrator, who is content with life and less adventurous, as symbolized by his bird cage and willingness to own Cat.  The KinderGuide

also adopts the novel's use of story-telling to convey information about Holly Golightly.

84.     Further, the KinderGuide *Breakfast at Tiffany's* makes use of many aspects and attributes of the Holly Golightly character, including but not limited to the following:

- Holly Golightly married to a man called "Doc" (a veterinarian) when she was very young, and lived on a farm in Texas.

- Holly moved from Texas to New York City and changed her name from Lula Mae/Lulamae to Holly Golightly.

- Holly Golightly has a cat that she calls "Cat." She has not named him because that would mean that she "owns" him.

- Holly Golightly loves the jewelry store Tiffany's & Co., particularly the diamonds. When she has what she calls the "mean reds"—a term Holly uses to mean that she feels afraid, but is not sure what she's afraid of—she goes to Tiffany's and that makes her feel better.

- Holly Golightly's card states "*Traveling*" where one would expect to see an address, consistent with her refusal to be tied down to one place.

- Holly does not work, but spends her time socializing. She visits a mobster named "Sally Tomato" every Thursday in SingSing prison. Her friends also include Rusty Trawler; Mag Wildwood; and Jose Ybarra-Jaeger.

- Holly Golightly has a brother named Fred who loves peanut butter, and tells the narrator that he reminds her of Fred.

- After she washes her hair, Holly Golightly sits on the fire escape with Cat, playing the guitar and sometimes singing along.

- Holly Golightly is implicated in Sally Tomato's wrongdoing and is thereafter the subject of newspaper articles that show her photo with headlines about the scandal. Shortly thereafter, she flees New York City for Brazil.

- Holly Golightly is a free spirit who doesn't take life or herself too seriously. She does zany and unexpected things like wearing an animal mask while walking around New York City. She also climbs up the fire escape and into the narrator's apartment through the window, uninvited, even though they do not know one another, and stays so long that the two fall asleep together.

85.     With respect to *On the Road*, plaintiffs' KinderGuide children's version again takes numerous copyrightable elements from the novel, including but not limited to the following:

- **The Plot and Sequence of Events.**  The story begins with Sal Paradise, the book's primary character, and his meeting with Dean Moriarty, a reckless and joyous troublemaker from Colorado who has just moved to New York with a blonde woman named Marylou.  The three new friends and the poet Carlo Marx spend a lot of time together in New York City talking about "writing and poetry and tricks."  After Dean returns to Denver, Sal decides to go on the road.  The KinderGuide version takes numerous details from Sal's trips and simply repackages them, sometimes conflating more than one trip, but still presenting events taken from the novel in the same sequence.  These include, but are not limited to, the following:

  o  On his way to visit Dean in Colorado, Sal hitches a ride with a talkative truck driver.  He enjoys the experience of sitting up high in the cab.  The driver blinks his lights to signal to another truck.  He eats a meal of apple pie and ice cream.  Sal then meets a man named Eddie and they travel together for a period of time.  At a diner in Nebraska, they see a farmer with a big booming laugh.  A carnival owner also asks them if they would like to work at the carnival, but they decline.

  o  Sal next hitches a ride in the back of a truck, which is full of interesting characters, including two men named "Montana Slim" and "Mississippi Gene."  When he arrives in Colorado, he finds Dean and meets his new girlfriend, Camille.  Sal and another friend named Major spend a weekend in an old miner's shack and go to the opera.

  o  On a bus from San Francisco to Los Angeles, Sal meets a pretty Mexican girl named Terry and gets a job picking cotton.  Sal begins to feel homesick for the east coast and takes a bus to Pittsburgh—as far as his money takes him—and then starts walking.  Along the road, he meets "the Ghost of the Susquehanna," an old hobo who walks the roads.  Sal also hears saxophone blues in a roadhouse and sleeps in the Harrisburg railroad station.  Exhausted and hungry, he finally hitches a ride with a salesman back to New York and his aunt's house, where he eats everything in the refrigerator.

  o  Sal and Dean then prepare for another road trip to Old Bull Lee's house in Louisiana.  Together with Carlo Marx and Marylou, heading through Washington D.C., South Carolina, Georgia and Florida.  Eventually, they arrive at Bull's house in Louisiana.  Bull (the teacher of the group) asks Sal and Dean questions about themselves that they are unable to answer and tells them stories about Morocco.

- o Sal and Dean then head out on another road trip, this time headed to Mexico. They drive through swamp country with they drive through a jungle with "snaky" trees a hundred feet tall and sleep on top of the car. In the middle of the night, Sal sees a white horse galloping down the road, directly toward them. When they arrive in Mexico City, they walk around the crowded city in a frenzy. It feels like they have found the "end" of their travels.

- o The story ends with Sal, back in New York, looking over the river as the sun sets and thinking about Dean and their travels.

- **The Characters.** Like the adult novel, the principal characters in the infringing KinderGuide version are (1) Sal Paradise and (2) his friend Dean Moriarty, a "wild guy from Colorado" and troublemaker who inspires Sal to go on the road. The KinderGuide also takes the characters (3) Marylou; (4) Carlo Marx, a poet and friend who accompanies Sal and Dean on some of their road trips; (5) Eddie; (6) a Nebraska farmer with a booming laugh; (7) Montana Slim and (8) Mississippi Jim; (9) Camille (Dean's new girlfriend); (10) Major; (11) "a pretty Mexican girl named Terry"; (12) a hobo called "the Ghost of the Susquehanna; and (13) Old Bull Lee, who asks them questions about themselves that they are unable to answer and tells them stories about Morocco.

- **The Settings.** Although the KinderGuide version collapses certain road trips, the settings are taken from the novel and, as set forth in the Plot description above, those settings are informed by events described in the novel.

- **Pace and Time.** Both works chronicle numerous road trips across the United States over a significant period of time.

- **The themes.** The infringing KinderGuide takes numerous themes from the novel, including friendship; adventure and exploration, particularly of the American West; arts and culture; rejection of, and the search for freedom from, authority; rejection of societal norms/counterculture; and travel, as both a kind of freedom and as part of a search for oneself and the perfect destination.

86.     With respect to *2001: A Space Odyssey*, defendants again rely on wholesale copying of numerous copyrightable elements, including but not limited to the following:

- **The Plot and Sequence of Events.** The Infringing Work's plot and sequence of events are taken directly from the novel. Both works open in 3 million years B.C., where a large crystal monolith teaches a tribe of man-apes, led by Moon-Watcher, to develop tools, thus influencing the evolution of mankind.

  The story next skips forward 3 million years, where a scientist named Dr. Heywood Floyd is bound for a space station on the moon so that he can

examine a monolith that has been discovered in a crater.  When light shines on the monolith, it emits a signal that communicates with one of Saturn's moons, Japetus.  *J*apetus is typically spelled *I*apetus in English; however, Clarke used the spelling derived from the Greek.

The story next shifts to the space shuttle *Discovery*, where two astronauts— David Bowman and Frank Poole—are on a secret mission, together with three colleagues who are cryogenically-frozen and an artificially-intelligent, allegedly-infallible computer named HAL, who controls the ship.  When HAL misdiagnoses the failure of a piece of communications equipment, the astronauts begin to think that HAL has malfunctioned.  And after this happens a second time, killing Poole, Bowman is convinced that something is seriously wrong.  He attempts to wake his frozen colleagues, but HAL opens the airlocks and they are sucked into space.  Bowman survives by hiding in an emergency shelter, putting on a spacesuit, and then shutting down all but HAL's non-autonomous functions.

Bowman then continues alone on the rest of the mission to Saturn.  Upon arrival, he heads toward the monolith in a space pod.  The monolith opens, sucking Bowman and the pod into an endless black hole filled with stars.  He loses all communication with the command center.

After drifting through the black hole, Bowman lands in a luxurious hotel room that seems to have been specifically designed to meet his needs.   He understands that the aliens are able to communicate via the monoliths, which they sent out in search of life on other planets.  Bowman is then reborn as an immortal named Star Child that can live in space, and heads toward Earth to save the planet from destruction.

- **The Characters.**  The unauthorized derivative work makes use of all of the primary characters, including (1) Moon-Watcher, the chief "man-ape;" (2) Dr. Heywood Floyd, a scientist tasked with investigating the monolith TMA-1; (3) Astronaut Dr. David Bowman, First Captain of the spaceship Discovery, who is ultimately transformed into Star-Child, a powerful immortal who can live in space; (4) Astronaut Dr. Francis (Frank) Poole, Bowman's friend and spaceship repair expert, who is killed by HAL; (5) 3 cryogenically-frozen astronauts, who are killed when HAL opens the airlocks on the ship; (6) HAL, the artificially-intelligent computer that threatens the welfare of the astronauts; and (7) the alien life force that altered the course of human evolution and makes Bowman immortal.

- **The Settings.**  The children's book also employs settings taken directly from the novel, including (1) the African desert, 3 million years B.C., where a monolith influences the progress of human evolution; (2) a space station on the moon, near the location where the monolith TMA-1 has been discovered; (3) aboard the spaceship *Discovery*; (4) on arrival at Japetus; (5) flying through a black hole that opens out of the second monolith, TMA-2; (6) a luxurious hotel suite that anticipates Bowman's desires and needs; (7) our

solar system, where Bowman (now Star Child) has returned to protect Earth from destruction.

- ▪ **Pace and Time.**  Both cover a period of millions of years, with the majority of the action occurring in the year 2001, as the title suggests.

- ▪ **The themes.**  The KinderGuide version also borrows the themes that were used in Clarke's novel, including (1) evolution; (2) intelligent life on other planets; (3) space travel; (4) artificial intelligence, and, more specifically, the potential dangers associated with inventing machines so "intelligent" that humans cannot fully understand or control them; (5) immortality; and (6) the potential destruction of the human race.

87.     Defendants have advertised and distributed the Infringing Works as children's versions of the Novels designed to attract and appeal to children aged 6 through 12.  The first four KinderGuides—those at issue here—identify the title and author of the adult novel as the author of the KinderGuide version (*see* image below).  A condensed children's version of a copyrighted work is a classic infringing use and a derivative work.



88.     Purchasers and readers of the KinderGuides will reasonably believe that the KinderGuides are produced or authorized by plaintiffs, who hold the copyrights in the subject novels.  Children will learn the title and author of the work, and adult purchasers are likely to

assume that these works are licensed children's versions of the original works, approved by the authors or their heirs for publication and reading to and by young children.

89.       Reasonable purchasers and readers will view the Infringing Works as derivative, children's editions of the Novels—a takeaway that is wholly consistent with defendants' marketing strategy.  The copy in the cover of each KinderGuide identifies it as a children's version of one of our "greatest literary works," "our most beloved classics," and "the stories and characters that shaped our culture."  The same is true of the KinderGuide Website, which exhorts purchasers and readers to:

> Join us as we introduce the greatest literary works to children everywhere.  Together we can lay the foundation for a lifelong appreciation for our most beloved classics and truly give parents and children a more inspired story time.  **Because classics are ageless.  And so are their readers.**

Defendants have further recently launched "teasers" or "trailers" that call out the principal characters from the Novels as the "stars" of the respective KinderGuide "children's books."  A screenshot from the "teaser" for "*On the Road*" is shown below (*available at* https://www.kinderguides.com/pages/book-teasers, last accessed January 11, 2017).



90.     As summarized above and set forth at greater length in **Exhibit E**, each of the Infringing Works copies and is entirely derivative of the plot, settings, themes, sequence of events, and principal characters in each of the Novels.  Defendants do nothing to transform the basic plot and characters.

91.     The illustrations defendants append to plaintiffs' works are not transformative; they do not alter plot elements, character descriptions, or the sequence of events.  Rather, the illustrations serve as an additional means of presenting elements copied from the Novels' plots, settings, themes, principal characters, and the like.  If plaintiffs wished to publish or license the right to publish illustrated versions of the Novels for young readers, that would be their right, but they have not elected to do so.  Indeed, whether to illustrate a work or rather to allow readers to exercise their imagination is a fundamental aspect of authorial discretion.

92.     To this infringing content, defendants have appended minimal collateral materials, including a blurb about the author (typical of any book), basic questions about the book (a device commonly used to engage young children in the reading process and equally common in adult books, for book groups and the like), and other superficial materials labelled "main characters" or "key words" or "analysis" that repeat elements of the story.  This added material—found primarily on the pages at the back of the book, typically referred to as back-matter—does not change the fact that the heart of each Infringing Work (and the clear majority of its pages) is dedicated to telling an expurgated version of its corresponding Novel.

93.     Although defendants call their Infringing Works "guides," the Infringing Works do not purport to be companion reference books or study guides for readers of the *Novels*, such as those commonly used by college students.  Indeed, it is hard to imagine a situation in which a 6-year-old child would have the need for a "study guide" to inform his or her understanding of

the adult Novels.  Instead, defendants' KinderGuides are stand-alone works target a wholly distinct audience—young children.

94.     Rather than commenting upon, criticizing, explaining or expanding on the nature or importance of the Novels or their authors, the KinderGuide editions are more closely akin to censored versions of the Novels.  Although defendants may contend that the back material provided in the Infringing Works explores "the cultures that spawned" the Novels, the "important takeways," and the "life and culture of the author," these superficial materials are categorically incapable of serving any transformative purpose for a young reader.  For example, the KinderGuide version of *On the Road* omits the sexual content, the depictions of male-female relationships, and the drug and alcohol use that made the Novel the definitive "voice" of the "beat" generation and that were essential elements of the culture that influenced Jack Kerouac. The confusion created by these expurgated versions of the Novels is even more pronounced and harmful to the extent one imagines—as defendants have suggested in the course of publicizing their KinderGuides product—that adult readers who are not fluent in English use the KinderGuides to familiarize themselves with the Novels.

95.     Indeed, *The New York Times*, *The Guardian*, *The Chicago Tribune* and *Forbes* have all criticized defendants' creation of these "watered-down" versions of the Novels.  *Forbes*, in particular, has called out the Infringing Works for their "censorship of art and meaning" in abridging the Novels for an audience of young children.  *The Guardian* has noted that defendants' "illustrated tales introducing youngsters to 'iconic works of classic literature' such as Jack Kerouac's beatnik adventure are missing the point," adding that "encountering a work such as *On the Road* or *The Old Man and the Sea* is best experienced on your own—and in the original" and not "[w]atered down, in picture-book format."

**Plaintiffs Learn of the Unauthorized Infringing Works**

96.     In or around late August 2016, PRH became aware of the publicity surrounding the upcoming publication of three titles that it publishes, *Breakfast at Tiffany's, On the Road,* and *2001: A Space Odyssey*, and initiated an investigation.  Because the KinderGuides appeared to be unauthorized derivative editions of the Novels, PRH concluded that it was necessary to take action against defendants to immediately stop publication before the first sale date.

97.     To that end, together with S&S as publisher of *Old Man*, counsel representing both publishers sent a cease-and-desist letter to defendants on or about September 21, 2016 demanding that they immediately halt publication and distribution of the unauthorized derivatives.

98.     Upon information and belief, immediately upon receipt of that September 21st letter demand, defendants proceeded to *advance* the date the Infringing Works would begin shipping from "October" to September 22nd as they announced on their website—the very day after that letter demand.

99.     Defendants, through their then-counsel, responded to the letter demand on or about October 5, 2016, refusing to cease and desist, and claiming that the KinderGuides were a protected fair use.

100.     Thereafter, counsel for the respective parties made an effort to amicably resolve the matter.  In connection therewith, defendants expressly agreed through counsel to cease advertising, promoting or distributing the unauthorized derivatives pending such discussions. Notwithstanding that agreement, defendants continued distributing the KinderGuides.  When plaintiffs learned that defendants were not trying to resolve the matter in good faith, they had no alternative but to bring this action to halt further publication and distribution of these unauthorized derivatives.

101.    Each of the unauthorized derivatives of the Novels is now available for purchase through defendants' website and via third-party retailers, including but not limited to Amazon, Barnes & Noble and Books-A-Million.  Defendants continue to promote their KinderGuides in interstate commerce.

**The Actual and Potential Impact on the Markets for the Novels
and Children's Versions of Them and Plaintiffs' Irreparable Injury**

102.    Plaintiffs' copyrights in the Novels have tremendous monetary value.

103.    The impact that the Infringing Works will have on the market for the original Novels, whether because they are viewed as a substitute for the originals or because they cause potential purchasers not to buy the original Novels, is incalculable.

104.    The right of first publication of a children's version of each of the Novels belongs exclusively with the party that controls the copyright in the original work.  That right of first publication, which plaintiffs have not yet chosen to exercise, is also of tremendous value to plaintiffs.

105.    The value of plaintiffs' rights to protect and preserve the editorial integrity of each of the Novels, and, separately, to decide ***not*** to publish children's versions of them, is unquantifiable.

106.    The misleading covers of the KinderGuides, and the promotion thereof by defendants, will cause unquantifiable marketplace confusion as to the origin or source of the Infringing Works, and whether they are authorized or licensed by plaintiffs or those who control the rights to authorize children's versions of the Novels.

107.    By their actions, defendants have wholly usurped both the actual and the potential markets for derivative children's versions authorized by plaintiffs.

**AS AND FOR A FIRST CLAIM FOR RELIEF**

(Copyright Infringement of ***The Old Man and the Sea***
By S&S and The Old Man and the Sea Plaintiffs)

108.    Plaintiffs S&S and Hemingway Copyrights, L.L.C., the Patrick Hemingway and Carol T. Hemingway Revocable Living Trust; and The Hemingway Family Trust (collectively, the "Hemingway Plaintiffs") repeat and reallege paragraphs 1 through and including 107 set forth hereinabove, as if the same were fully set forth herein.

109.    The Hemingway Plaintiffs and/or agents acting on their behalf have duly registered for copyright protection in the United States Copyright Office the work entitled *The Old Man and the Sea* by Ernest Hemingway and all formalities in connection therewith have been duly complied with.  This novel is therefore subject to valid and subsisting protection under the laws of the United States.

110.    Defendants admittedly had access to *The Old Man and the Sea* prior to creation of the unauthorized KinderGuide.

111.    Defendants have published, advertised, distributed and sold a work which is substantially similar to *The Old Man and the Sea*, without the permission or authority of the Hemingway Plaintiffs.

112.    Defendants have infringed the Hemingway Plaintiffs' exclusive copyright interests in *The Old Man and the Sea*.

113.    As a direct and proximate result thereof, the Hemingway Plaintiffs have been injured in an amount presently unknown and to be determined at time of trial, by reason of defendants' intentional and willful acts.

114.    The injury that the Hemingway Plaintiffs have suffered and will continue to suffer unless defendants' acts of infringement are enjoined is irreparable.

115.    The Hemingway Plaintiffs have no adequate remedy at law.

## AS AND FOR A SECOND CLAIM FOR RELIEF

(Copyright Infringement of the exclusive right to create
works derivative of *The Old Man and the Sea* by the Hemingway Plaintiffs)

116.    The Hemingway Plaintiffs repeat and reallege paragraphs 1 through and including 107 and 108 through and including 115 set forth hereinabove, as if the same were fully set forth herein.

117.    The Hemingway Plaintiffs hold the exclusive right to create, or authorize others to create derivative works based upon *The Old Man and the Sea*.

118.    Defendants' unauthorized derivative KinderGuide of this Novel is substantially similar to *The Old Man and the Sea* by reason of defendants' use of the plot, characters, combined with numerous other incidents and settings as appear in *The Old Man and the Sea* and use of some of Hemingway's expression and/or close paraphrase thereof from *The Old Man and the Sea* in the unauthorized derivative.

119.    The KinderGuide of *The Old Man and the Sea* is an unauthorized derivative work of *The Old Man and the Sea*.

120.    Defendants have infringed the Hemingway Plaintiffs' exclusive copyright interest in *The Old Man and the Sea*.

121.    As a direct and proximate result, the Hemingway Plaintiffs have been injured in an amount presently unknown and to be determined by time of trial, by reason of defendants' intentional and willful acts.

122.    The injury that the Hemingway Plaintiffs have suffered and will continue to suffer unless defendants are enjoined and restrained is irreparable.

## AS AND FOR A THIRD CLAIM FOR RELIEF

(Copyright Infringement of *Breakfast at Tiffany's*
By PRH and The Truman Capote Literary Trust)

123.    Plaintiffs PRH and The Truman Capote Literary Trust (collectively, the "Capote Plaintiffs") repeat and reallege paragraphs 1 through and including 107 set forth hereinabove, as if the same were fully set forth herein.

124.    The Capote Plaintiffs and/or agents acting on their behalf have duly registered for copyright protection in the United States Copyright Office the work entitled *Breakfast at Tiffany's* by Truman Capote and all formalities in connection therewith have been duly complied with.  This novel is therefore subject to valid and subsisting protection under the laws of the United States.

125.    Defendants had access to *Breakfast at Tiffany's* prior to creation of the unauthorized KinderGuide.

126.    Defendants have published, advertised, distributed and sold a work which is substantially similar to *Breakfast at Tiffany's*, without the permission or authority of the Capote Plaintiffs.

127.    Defendants have infringed the Capote Plaintiffs' exclusive copyright interests in *Breakfast at Tiffany's*.

128.    As a direct and proximate result thereof, the Capote Plaintiffs have been injured in an amount presently unknown and to be determined at time of trial, by reason of defendants' intentional and willful acts.

129.    The injury that the Capote Plaintiffs have suffered and will continue to suffer unless defendants acts of infringement are enjoined is irreparable.

130.    The Capote Plaintiffs have no adequate remedy at law.

## AS AND FOR A FOURTH CLAIM FOR RELIEF

(Copyright Infringement of the Holly Golightly Character
by The Truman Capote Literary Trust)

131.    The Truman Capote Literary Trust repeats and realleges paragraphs 1 through and including 107 and 123 through including 130 set forth hereinabove, as if the same were fully set forth herein.

132.    By reason of The Truman Capote Literary Trust's copyright registration of the work entitled *Breakfast at Tiffany's* above-described, said plaintiff has copyright protection for the principal character in that work, Holly Golightly.

133.    Holly Golightly is a fully delineated character, recognizable on a stand-alone basis, and entitled to the full benefits of copyright protection under law.

134.    Defendants had access to *Breakfast at Tiffany's* and the Holly Golightly character prior to creation of their unauthorized infringing work.

135.    Defendants have published, advertised, distributed and sold the unauthorized derivative featuring the Holly Golightly character in the United States including all of her distinctive attributes, character traits, and other characteristics.

136.    The character of Holly Go Lightly in the unauthorized derivative is substantially similar to the character of Holly Golightly in *Breakfast at Tiffany's*; indeed, the characters in the two works are one and the same.

137.    Defendants have infringed The Truman Capote Literary Trust's exclusive copyright interest in the character of Holly Golightly.

138.    Defendants have infringed The Truman Capote Literary Trust's exclusive copyright interest in the character of Holly Golightly.

139.    As a direct and proximate result thereof, plaintiff has been injured, in an amount presently unknown and to be determined at time of trial, by reason of defendants' intentional and willful acts.

140.    The injury that plaintiff has suffered and will continue to suffer unless defendants' acts of infringements are enjoined is irreparable.

141.    Plaintiff has no adequate remedy at law.

### AS AND FOR A FIFTH CLAIM FOR RELIEF

(Copyright Infringement of the exclusive right to create
works derivative of *Breakfast at Tiffany's* by the Capote Plaintiffs)

142.    The Capote Plaintiffs repeat and reallege paragraphs 1 through and including 107, 123 through and including 130, and 131 through and including 141 set forth hereinabove, as if the same were fully set forth herein.

143.    The Capote Plaintiffs hold the exclusive right to create, or authorize others to create derivative works based upon *Breakfast at Tiffany's*.

144.    The Defendants' unauthorized derivative KinderGuide of this Novel is substantially similar to *Breakfast at Tiffany's* by reason of defendants' use of the plot, characters including but not limited to the fully-delineated and famous Holly Golightly character, combined with numerous other incidents and settings as appear in *Breakfast at Tiffany's* and use of some of Capote's expression and/or close paraphrase thereof from *Breakfast at Tiffany's* in the unauthorized derivative.

145.    The KinderGuide of *Breakfast at Tiffany's* is an unauthorized derivative work of *Breakfast at Tiffany's*.

146.    Defendants have infringed the Capote Plaintiffs' exclusive copyright interest in *Breakfast at Tiffany's*.

147.    As a direct and proximate result, the Capote Plaintiffs have been injured in an amount presently unknown and to be determined by time of trial, by reason of defendants' intentional and willful acts.

148.    The injury that plaintiffs have suffered and will continue to suffer unless defendants are enjoined and restrained is irreparable.

## AS AND FOR A SIXTH CLAIM FOR RELIEF

(Copyright Infringement of *2001: A Space Odyssey*)
By PRH and The Dr. Arthur C. Clarke Trust

149.    Plaintiffs PRH and The Dr. Arthur C. Clarke Trust (the "2001: A Space Odyssey Plaintiffs") repeat and reallege paragraphs 1 through and including 107 set forth hereinabove, as if the same were fully set forth herein.

150.    The 2001: A Space Odyssey Plaintiffs and/or agents acting on their behalf have duly registered for copyright protection in the United States Copyright Office the work entitled *2001: A Space Odyssey* by Arthur C. Clarke and all formalities in connection therewith have been duly complied with.  This novel is therefore subject to valid and subsisting protection under the laws of the United States.

151.    Defendants admittedly had access to *2001: A Space Odyssey* prior to creation of the unauthorized KinderGuide.

152.    Defendants have published, advertised, distributed and sold a work which is substantially similar to *2001: A Space Odyssey*, without the permission or authority of the aforementioned plaintiffs.

153.    Defendants have infringed plaintiffs' exclusive copyright interests in *2001: A Space Odyssey*.

154.    As a direct and proximate result thereof, plaintiffs have been injured in an amount presently unknown and to be determined at time of trial, by reason of defendants' intentional and willful acts.

155.    The injury that the plaintiffs have suffered and will continue to suffer unless defendants' acts of infringement are enjoined is irreparable.

156.    Plaintiffs have no adequate remedy at law.

## AS AND FOR A SEVENTH CLAIM FOR RELIEF

(Copyright Infringement of the exclusive right to create works derivative of
*2001: A Space Odyssey* by the 2001: A Space Odyssey Plaintiffs)

157.    The 2001: A Space Odyssey Plaintiffs repeat and reallege paragraphs 1 through and including 107, and 149 through and including 156 set forth hereinabove, as if the same were fully set forth herein.

158.    The aforementioned plaintiffs hold the exclusive right to create, or authorize others to create derivative works based upon *2001: A Space Odyssey*.

159.    The Defendants' unauthorized derivative KinderGuide of this Novel is substantially similar to *2001: A Space Odyssey* by reason of defendants' use of the plot, characters, combined with numerous other incidents and settings as appear in *2001: A Space Odyssey* and use of some of Clarke's expression and/or close paraphrase thereof from *2001: A Space Odyssey* in the unauthorized derivative.

160.    The KinderGuide of *2001: A Space Odyssey* is an unauthorized derivative work of *2001: A Space Odyssey*.

161.    Defendants have infringed the plaintiffs' exclusive copyright interest in *2001: A Space Odyssey*.

162.    As a direct and proximate result, plaintiffs have been injured in an amount presently unknown and to be determined by time of trial, by reason of defendants' intentional and willful acts.

163.    The injury that plaintiffs have suffered and will continue to suffer unless defendants are enjoined and restrained is irreparable.

## AS AND FOR AN EIGHTH CLAIM FOR RELIEF

(Copyright Infringement of *On the Road*
By PRH and the On the Road Plaintiffs)

164.    PRH and the On the Road Plaintiffs (together, the "Kerouac Plaintiffs") repeat and reallege paragraphs 1 through and including 107 set forth hereinabove, as if the same were fully set forth herein.

165.    The On the Road Plaintiffs and/or agents acting on their behalf have duly registered for copyright protection in the United States Copyright Office the work entitled *On the Road* by Jack Kerouac and all formalities in connection therewith have been duly complied with. This novel is therefore subject to valid and subsisting protection under the laws of the United States.

166.    Defendants admittedly had access to *On the Road* prior to creation of the unauthorized KinderGuide.

167.    Defendants have published, advertised, distributed and sold a work which is substantially similar to *On the Road*, without the permission or authority of the aforementioned plaintiffs.

168.    Defendants have infringed the Kerouac Plaintiffs' exclusive copyright interests in *On the Road*.

169.    As a direct and proximate result thereof, the Kerouac Plaintiffs have been injured in an amount presently unknown and to be determined at time of trial, by reason of defendants' intentional and willful acts.

170.    The injury that the Kerouac Plaintiffs have suffered and will continue to suffer unless defendants' acts of infringement are enjoined is irreparable.

171.    Plaintiffs have no adequate remedy at law.

## AS AND FOR A NINTH CLAIM FOR RELIEF

(Copyright Infringement of the exclusive right to create
works derivative of *On the Road* by the Kerouac Plaintiffs)

172.    The Kerouac Plaintiffs repeat and reallege paragraphs 1 through and including 107, and 164 through and including 171 set forth hereinabove, as if the same were fully set forth herein.

173.    The Kerouac Plaintiffs hold the exclusive right to create, or authorize others to create derivative works based upon *On the Road*.

174.    The Defendants' unauthorized derivative KinderGuide of this Novel is substantially similar to *On the Road* by reason of defendants' use of the plot, characters, combined with numerous other incidents and settings as appear in *On the Road* and use of some of Kerouac's expression and/or close paraphrase thereof from *On the Road* in the unauthorized derivative.

175.    The KinderGuide version of *On the Road* is an unauthorized derivative work of *On the Road*.

176.    Defendants have infringed plaintiffs' exclusive copyright interest in *On the Road*.

177.     As a direct and proximate result, the Kerouac Plaintiffs have been injured in an amount presently unknown and to be determined by time of trial, by reason of defendants' intentional and willful acts.

178.     The injury that the Kerouac Plaintiffs have suffered and will continue to suffer unless defendants are enjoined and restrained is irreparable.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully requests that this Court enter judgment as follows:

1.     Preliminarily and permanently enjoining defendants and each of them and all those acting at their direction or pursuant to their control, from reproducing, publishing, distributing, advertising, selling or otherwise disseminating the unauthorized KinderGuides for each of the Novels in or to the United States;

2.     Ordering that defendants recall any copies of the unauthorized KinderGuides that are already out of their possession and/or in circulation in the United States, and to take such steps as necessary to ensure their return;

3.     Ordering that defendants destroy all copies of the unauthorized KinderGuides to the Novels in the United States in their possession, custody or control;

4.     Granting plaintiffs, at each of their respective elections, damages in an amount to be determined at time of trial and/or defendants' infringing profits, or statutory damages;

5.     Granting plaintiffs their respective prevailing parties attorneys' fees and related costs in this action pursuant to 17 U.S.C. § 505; and

6.     Granting plaintiffs such other and further relief as to this Court shall seem just and proper.

Dated: New York, New York
           January 19, 2017

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By:  /s/ Marcia B. Paul
           Marcia B. Paul

1251 Avenue of the Americas, 21st Floor
New York, NY  10020-1104
(212) 489-8230 Phone
(212) 489-8340 Fax

*Attorneys for Plaintiffs*