UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
PENGUIN RANDOM HOUSE LLC; SIMON &      :        17-cv-386 (JSR)
SCHUSTER, INC.; ALAN U. SCHWARTZ       :
as trustee of THE TRUMAN CAPOTE        :        OPINION AND ORDER
LITERARY TRUST; JOHN SAMPAS as         :
Literary Representative of THE         :
ESTATE OF JACK KEROUAC; NANCY          :
BUMP; ANTHONY M. SAMPAS; JOHN          :
LASH, Executor of THE ESTATE OF        :
JAN KEROUAC; THE DR. ARTHUR C.         :
CLARKE TRUST; HEMINGWAY COPYRIGHTS,    :
LLC; THE PATRICK HEMINGWAY AND         :
CAROL T. HEMINGWAY REVOCABLE           :
LIVING TRUST; and THE HEMINGWAY        :
FAMILY TRUST,                          :
                                       :
              Plaintiffs,              :
                                       :
         -v-                           :
                                       :
FREDERIK COLTING and MELISSA           :
MEDINA, d/b/a MOPPET BOOKS,            :
                                       :
              Defendants.              :
------------------------------------x



JED S. RAKOFF, U.S.D.J.

On January 19, 2017, Penguin Random House LLC, Simon &

Schuster, Inc., Alan U. Schwartz as trustee of The Truman Capote

Literary Trust, John Sampas as literary representative of The Estate

of Jack Kerouac, Nancy Bump, Anthony M. Sampas, John Lash as

executor of The Estate of Jan Kerouac, The Dr. Arthur C. Clarke

Trust, Hemingway Copyrights, LLC, The Patrick Hemingway And Carol T.

Hemingway Revocable Living Trust, and The Hemingway Family Trust

(collectively "plaintiffs") brought this suit against Fredrik

Colting and Melissa Medina (d/b/a Moppet Books) (collectively

"defendants"), alleging nine counts of copyright infringement.

Plaintiffs are the owners and exclusive licensees of copyrights in four famous novels: Breakfast at Tiffany's by Truman Capote, The Old Man and the Sea by Ernest Hemingway, On the Road by Jack Kerouac, and 2001: A Space Odyssey by Arthur C. Clarke (collectively, the "Novels"). Defendants have published "a series of illustrated children's books" "based on" these Novels (collectively, the "Guides"), which contain "condensed, simplified version[s] of the[ir] plot[s]." See Defendants' Response to Plaintiffs' Rule 56.1 Statement of Material Facts ("Def. 56.1 St."), ECF No. 44 ¶¶ 65, 89.

Following the completion of discovery, plaintiffs sought summary judgment in their favor on the issue of liability, and defendants cross-moved for summary judgment in their favor on the issue of liability and on the affirmative defense of fair use. Plaintiffs also moved for summary judgment on the issue of willfulness. In a bottom line order dated July 28, 2017, ECF No. 47, the Court granted summary judgment to plaintiffs on all nine counts of copyright infringement — two for each of the four Novels and one for the character of Holly Golightly — and rejected the affirmative defense of fair use as a matter of law. On the issue of willfulness, the Court permitted defendants, based on representations made by their counsel in open court, see Transcript, dated July 24, 2017, ECF No. 48, to raise (somewhat belatedly) an advice of counsel defense and permitted additional discovery on that defense. As a consequence of that decision, plaintiffs no longer seek summary judgment on the issue of willfulness, and the Court has set the case

down for trial on October 2, 2017 to resolve the remaining issues. See Order, ECF No. 51.

This Opinion and Order sets forth the reasons for these rulings.

The pertinent facts, either undisputed, or, where disputed, taken most favorably to the respective non-movant, are as follows:

At all times here relevant, plaintiffs owned valid copyrights to Breakfast at Tiffany's, The Old Man and the Sea, On the Road, and 2001: A Space Odyssey. Def. 56.1 St. ¶¶ 1-13. Defendants' "colorfully illustrated story summaries," called "KinderGuides," are designed to "introduce" these works to children. Id. ¶ 68.

On or about September 22, 2016, defendants published their four Guides (part of a planned 50-book series). Id. ¶ 65. On their front covers, the Guides very prominently display the titles of plaintiffs' Novels and the names of the authors of plaintiffs' Novels, along with the words "KinderGuides," in large print and, in much smaller print, the words "Early Learning Guides to Culture Classics." Declaration of Marcia B. Paul, Esq. in Support of Plaintiffs' Motion for Summary Judgment ("Paul Decl."), Exs. 49-52, ECF No. 35. The only other words are "Illustrations by _____," in very small print at the bottom.

All four Guides share the same layout. The first four pages feature illustrations and one-line quotations taken from and attributed to the authors of the Novels (Capote, Hemingway, Kerouac, and Clarke). The fifth page contains publication information, and

3

the sixth is a title page, stating, to take one example,

"KinderGuides: Early Learning Guides to Culture Classics," "On the

Road," "by Jack Kerouac," and, in smaller font, "Illustrations by

Rose Forshall," "a division of Moppet Books/Los Angeles, CA." The

seventh and eighth pages contain a "Table of Contents." The ninth

displays an illustration of the original author of the Novel, and

the tenth is a page "About the Author." Following these front-pages

are "Story Summaries," which comprise a few dozen pages. Appended

after these "Story Summaries" are a series of back-pages, two each

devoted to "Main Characters," "Key Words," "Quiz Questions," and

"Analysis." See Paul Decl., Exs. 49-52.

Defendants admit that they had access to plaintiffs' Novels in

preparing their Guides and that they relied on them. Def. 56.1 St. ¶

73. Indeed, a side-by-side comparison of plaintiffs' and defendants'

works reveals as much. Not only do the plots, settings, and

characters of the Guides mirror the Novels, but the Guides also

include many specific details from the Novels. For example, in both

versions of Breakfast at Tiffany's, Holly Golightly's business card

reads "Holly Golightly, Traveling," and in both versions Holly

describes an experience she calls "the mean reds," or feeling afraid

"but you don't know what you're afraid of." See Paul Decl., Ex. 46,

Truman Capote, Breakfast at Tiffany's (2012 edition) at 32 ("the

mean reds are horrible. You're afraid . . . but you don't know what

you're afraid of"); Id., Ex. 50, KinderGuides, Breakfast at

Tiffany's (2016) at 11, (". . . the mean reds. That means she is

4

afraid but doesn't know what she is afraid of."). Similarly, in both versions of On the Road, Sal drives across the United States with $50 in his pocket and goes to see a blind jazz pianist named George Shearing; in both versions of 2001: A Space Odyssey, Dr. Heywood Floyd travels to Clavius Base, a space station on the moon, where there is a large monolith named "TMA-1" and a crater named "Tyco"; and, in both versions of The Old Man and the Sea, Santiago has gone 84 days without catching a fish and roots for the New York Yankees.[1] See Paul Decl., Exs. 45-52. While, of course, many aspects of plaintiffs' Novels do not appear in defendants' shorter Guides, all of the plots, characters, and settings in defendants' Guides appear in plaintiffs' Novels.

It is also undisputed that there is an established market for children's books based on adult novels, and that it is not unusual for copyright holders to publish, or license publication of, children's versions of works originally intended for adults. Def. 56.1 St. ¶¶ 95, 145 (noting that "Defendant Colting understood, prior to publishing the KinderGuides, that there was a market for children's editions of adult novels"). Defendants, however, never sought permission to prepare children's guides for plaintiffs' Novels. Id. ¶ 150.

It is further undisputed that plaintiffs have never authorized anyone to publish children's versions of their Novels, Def. 56.1 St.

---

[1] Admittedly, the Old Man of this Court shares the latter failing.

¶ 97. The managers of Hemingway's literary estate altogether rejected requests to create children's versions of <u>The Old Man and the Sea</u>. <u>Id.</u> ¶ 101. Penguin Random House considered authorizing a children's version of <u>2001: A Space Odyssey</u>, but decided against it. <u>Id.</u> ¶ 105. The Capote estate did authorize the creation of an illustrated, stand-alone children's version of <u>A Christmas Memory</u> – a short story originally included in the same volume as <u>Breakfast at Tiffany's</u> – but did not authorize a children's version of <u>Breakfast at Tiffany's</u>. <u>Id.</u> ¶ 108. Finally, Penguin Random House and the Clarke Estate have authorized the creation of an ESL ("English as a Second Language") version of <u>2001: A Space Odyssey</u> - "a simplified version," which includes "inserted pages of exercises and notes," but no children's versions. <u>Id.</u> ¶ 114.

Discussion

When parties cross-move for summary judgment, the Court analyzes the motions separately, "in each case construing the evidence in the light most favorable to the non-moving party." <u>Victorinox AG v. B & F Sys., Inc.</u>, 114 F. Supp. 3d 132, 135 (S.D.N.Y. 2015) (quoting <u>Novella v. Westchester Cnty.</u>, 661 F.3d 128, 139 (2d Cir. 2011)). "Summary judgment is appropriate only if the moving party shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." <u>Miller v. Wolpoff & Abramson, L.L.P.</u>, 321 F.3d 292, 300 (2d Cir. 2003); Fed. R. Civ. P. 56(c). The court "must draw all

reasonable inferences and resolve all ambiguities in favor of the non-moving party." Castle Rock Entm't, Inc. v. Carol Pub. Grp., Inc., 150 F.3d 132, 137 (2d Cir. 1998) ("Castle Rock") (quoting Garza v. Marine Transp. Lines, Inc., 861 F.2d 23, 26 (2d Cir. 1988)).

## A. Infringement

The Copyright Act of 1976 (the "Copyright Act"), 17 U.S.C. §§ 101-805, grants copyright owners a bundle of exclusive rights, including the exclusive right to "reproduce the copyrighted work" and the exclusive right "to prepare derivative works based upon the copyrighted work." Id. § 106; Castle Rock, 150 F.3d at 137. Here, plaintiffs allege that defendants' Guides infringe both those rights. See Amended Complaint, ECF No. 11 ¶¶ 108-178.

To prevail on either ground, plaintiffs must prove that: (1) they hold a valid ownership interest in the relevant copyrights, (2) defendants have "actually copied" their works, and (3) defendants' "copying is illegal" because of a "substantial similarity" between defendants' works and the "protectable elements" of their copyrighted works. Castle Rock, 150 F.3d at 137. To prevail on the second ground, plaintiffs must further prove that (4) defendants' works are unauthorized derivatives under 17 U.S.C. § 106(2).[2]

---

[2] With respect to the first ground, the question of whether defendants' Guides are derivative works is "completely superfluous," as "infringement of the adaptation right necessarily infringes the reproduction right." Twin Peaks Prods., Inc. v. Publications Int'l, Ltd., 996 F.2d 1366, 1373 (2d Cir. 1993) (citing 2 Nimmer § 8.09[A] at 8-114)).

(1)   Valid Ownership

As noted, plaintiffs allege, and defendants do not dispute, that plaintiffs hold valid and subsisting copyrights (and licenses) in the Novels at issue in this case. Def. 56.1 St. ¶¶ 6-12. Further, plaintiffs have produced registration certificates and applicable renewals for these copyrights. See Amended Complaint, Exs. A-D. Such documents constitute prima facie evidence of valid ownership. See 17 U.S.C. § 410(c); Novelty Textile Mills, Inc. v. Joan Fabric Corp., 558 F.2d 1090, 1092, n.1 (2d Cir. 1977). Such registrations also protect the Novels' fictional characters, including Holly Golightly, the protagonist of Breakfast at Tiffany's. See Salinger v. Colting, 641 F. Supp. 2d 250, 254 (S.D.N.Y. 2009) (finding that a novel's protagonist is protected by the author's copyright in the novel), vacated and remanded on other grounds, 607 F.3d 68 (2d Cir. 2010).

(2)   Actual Copying

Having therefore carried their burden with respect to copyright ownership, plaintiffs must next show that their "work was actually copied." Actual copying may be established (a) "by direct evidence of copying" or (b) "by indirect evidence, including access to the copyrighted work, similarities that are probative of copying between the works, and expert testimony." Laureyssens v. Idea Group, Inc., 964 F.2d 131, 140 (2d Cir. 1992). The question of "actual copying" is distinct from, and precedes, the question of infringement and "substantial similarity." To prove actual copying, however, plaintiffs need only show "probative" similarity — that the creators

of the allegedly infringing works drew from the copyrighted works.
See Castle Rock, 150 F.3d at 137; Jorgensen v. Epic/Sony, 351 F.3d
46, 54-57 (2d Cir. 2003).

Here, the undisputed facts easily establish actual copying.
Defendants admit that, in preparing their Guides, they read
plaintiffs' Novels. Def. 56.1 St. ¶ 73. Further, defendants display
the actual titles of plaintiffs' Novels on the front covers of their
Guides and concede that their Guides are "based on the novels." Id.
¶ 74. This constitutes actual copying as a matter of law. See
Paramount Pictures Corp. v. Carol Pub. Grp., Inc., F. Supp. 2d 329,
332-3 (S.D.N.Y. 1998), aff'd sub nom. 181 F.3d 83 (2d Cir. 1999)
("Star Trek") (arguing that "it would be absurd to suggest that"
actual copying did not occur in a case where defendant's work "is
devoted to telling a large portion" of the story in plaintiff's
work).

(3)  Substantial Similarity

After "actual copying is established," plaintiffs must
"demonstrate that the copying was improper or unlawful by showing
that the second work bears 'substantial similarity' to protected
expression in the earlier work." Castle Rock, 150 F.3d at 137
(quoting Repp v. Webber, 132 F.3d 882, 889 (2d Cir. 1997);
Laureyssens v. Idea Group, Inc., 964 F.2d 131, 140 (2d Cir. 1992)).
Specifically, plaintiffs must prove that the copying is
"quantitatively and qualitatively sufficient to support the legal
conclusion that infringement (actionable copying) has occurred."

Castle Rock, 150 F.3d at 138 (quoting Ringgold v. Black
Entertainment Television, Inc., 126 F.3d 70, 75 (2d Cir. 1997)). The
qualitative prong regards the nature of the copied expression - it
must be "protected." The quantitative prong regards the amount of
such copying - it must be more than de minimis. Id.

There are a variety of special tests that courts sometimes
apply to assess substantial similarity. These tests are designed to
assist courts in determining whether protectable expression has been
copied, particularly in situations where the relevant works are, at
least superficially, distinct from each other. For example, for non-
textual works, courts often employ Learned Hand's "ordinary
observer" test, which he first used to compare two dress designs.
Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, 489
(2d Cir. 1960) (Hand, J.). For textual works, where two otherwise
dissimilar pieces include similar sentences and wording, courts
frequently apply the "fragmented literal similarity test," which
"focuses upon copying of direct quotations or close paraphrasing."
Castle Rock, 150 F.3d at 140. By contrast, when two works do not
have literal, word-for-word similarity, courts sometimes apply the
"comprehensive non-literal similarity" test, weighing the "total
concept and feel" of the works including their "theme, characters,
plot, sequence, pace, and setting." Castle Rock, 150 F.3d at 140
(citing 4 Melville B. Nimmer and David Nimmer, Nimmer on Copyright §
13.03 [A][1] at 13-24 (1997)). The "comprehensive non-literal
similarity" test allows a plaintiff to enforce its copyright in a

case where, though there is little or no word-for-word similarity,

the defendant has nonetheless appropriated "the fundamental essence

or structure" of plaintiffs' work. Id.

In the instant case, however, none of these special tests is

even needed to establish substantial similarity, as defendants'

Guides are not even superficially distinct from the respective

Novels. Instead, they are explicitly based on plaintiffs' Novels,

and seek in defendant's words, to "introduce" them to children

"through colorfully illustrated story summaries and kid-friendly

analyses." Def. 56.1 St. ¶¶ 68, 74-76.

To avoid, therefore, this obvious similarity, defendants would

have the Court, in effect, subtract from defendants' Guides the

characters, plots, and settings that were directly lifted from

plaintiffs' Novels, on the ground that these elements do not

constitute protectable expression. See Knitwaves, Inc. v. Lollytogs

Ltd., 71 F.3d 996, 1002 (2d Cir. 1995) (noting that a court must

limit its infringement inquiry to whether "the protectable elements,

standing alone, are substantially similar").

Defendants make several arguments in support of this approach.

First, defendants claim that the characters, plots, and settings in

plaintiffs' Novels are merely "a collection of made-up facts" or

"fictional facts," and, since (historical or independently-existing)

facts are not protected, these elements are not aspects of "an

author's original expression" subject to copyright. Defendants'

Memorandum of Law in Support of Summary Judgment ("Def. Mem.") at 4-

5. As defendants put it, their Guide to 2001: A Space Odyssey "merely summarized some of the facts of the book and the characters, not the creative expression that makes Dr. David Bowman and HAL [the characters] memorable." Def. Mem. at 9 (emphasis added). In other words, the aspects of plaintiffs' Novels that appear in defendants' Guides, such as the character of Holly Golightly, her place of residence, her trips to the prison, her relationship to Sally Tomato, are not protected expression but, according to defendants, "fictional facts."

This exercise in sophistry, however, which confuses the difference between historical or independently-existing facts and fictional details created by a novelist, finds no support in applicable law. As the Second Circuit has clearly stated, "characters and events" that "spring from the imagination" of authors are copyrightable, creative expression. See Castle Rock, 150 F.3d at 139. Thus, the Copyright Act protects both the literal text describing, for example, Dr. Bowman and HAL, and the "made-up facts" about Dr. Bowman and HAL. "Unlike the facts in a phone book, which do not owe their origin to an act of authorship," each "fact" in defendants' Guides is really "fictitious expression" created by plaintiffs' authors. Castle Rock, 150 F.3d at 139. Because the "characters and events" in defendants' Guides "spring from the imagination of" Capote, Hemingway, Kerouac, and Clarke, each Guide "plainly copies copyrightable, creative expression." Id. (citing Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 347

12

(1991)) (discussing the distinction between "discovered facts," which do not "owe their origin to an act of authorship" and thus are not protected by copyright, and "created facts," which constitute original, protected expression).

Second, defendants argue that the characters in plaintiffs' works are unprotectable "stock characters." For example, Breakfast at Tiffany's is, according to defendants, just the story of "a small town girl with a tough past who has come to the big city." Dean, in On the Road, is just "a stereotypical womanizing, wild guy and Sal, our narrator, is portrayed as a young writer." Thus, defendants argue, Sal and Dean are simply "stock characters and do not warrant copyright protection." Def. Mem. at 10.

Defendants again misstate the law. While copyright law does not protect basic characters and stock figures, see Nichols v. Universal Pictures Corp., 45 F.2d 119, 122 (2d Cir. 1930), copyright law does protect characters who are sufficiently delineated to be original. As the Seventh Circuit points out, in the very case defendants cite, a knowledgeable old wino is not a copyrightable character per se, but one named Cogliostro with an obviously phony title ("Count") and faintly Mosaic facial features is protected. "No more is required for a character copyright." Gaiman, 360 F.3d at 660. See also Detective Comics v. Bruns Publications, 111 F.2d 432, 433 (2d Cir. 1940) (finding that "Wonderman," a superhero with only superficial differences from "Superman" is infringing, even though both are drawn from the same basic Herculean character type).

13

The general rule is that, where defendants' works use "more than general types and ideas and have appropriated the pictorial and literary details embodied in the complainant's copyrights," defendants' works are infringing. Detective Comics, 111 F.2d at 433. Here, defendants do not even attempt to conceal their copying. Indeed, their explicit intention was to lift plaintiffs' characters to "introduce" them to children. Thus, for example, defendants' version of Breakfast at Tiffany's does not tell the story of just any "small town girl with a tough past," but the story of the very distinctive Holly Golightly. And, as noted, defendants make a point of copying the very expression of that distinctiveness, such as the text on Holly's business card and her original idiom "the mean reds." Similarly, defendants' Guide to On the Road is not just about a "womanizing wild guy," but a distinctive womanizing wild guy named Dean who travels across the country having particular adventures with his equally distinctive friend Sal.

Third, defendants argue in that latter regard that the plots of plaintiffs' Novels, which defendants reproduce in their Guides, are merely unprotectable "scenes à faire," or "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic." Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 979 (2d Cir. 1980). For example, defendants argue that The Old Man and the Sea is a classic "man versus nature" story for which "a trip in nature, the struggle against the fish, reflecting on nature, triumph and defeat" are

unprotected. 2001: A Space Odyssey, defendants say, is simply a "man versus technology" plot, hence the elements which naturally arise from it ("a space station, space shuttle, an intelligent machine, tragedy in space, overcoming technology") are not protected. Similarly, Breakfast at Tiffany's is a "man versus himself plot," and On the Road is "a man versus society" plot. Def. Mem. at 7.

On defendants' absurd theory, the plot of Don Quixote is simply Cervantes' hackneyed version of The Odyssey. Defendants totally ignore the well-developed distinction that while general plot ideas are not copyrightable, specific ones are. See Stodart v. Mut. Film Corp., 249 F. 507, 509 (S.D.N.Y. 1917), aff'd, 249 F. 513 (2d Cir. 1918) (comparing two plots and finding them substantially similar); Nichols, 45 F.2d at 120 (outlining the distinction); Williams v. Crichton, 84 F.3d 581, 587-89 (2d Cir. 1996) (exploring the distinction). Defendants' Guides do not tell stories that share similar plot elements with plaintiffs' work. They retell, albeit in abridged fashion, the very same stories including the very same characters, incidents, settings, and plot twists as the original Novels. To be sure, they do not copy every single incident, but it is well established as a matter of law that "no plagiarist can excuse the wrong by showing how much of his work he did not pirate." Sheldon v. Metro-Goldwyn Pictures Corp., 81 F.2d 49, 56 (2d Cir. 1936). Nor need a work create the same "feel" or effect as the copyrighted work to be infringing. See Castle Rock (where defendants infringed on plaintiffs' copyright in a TV show by publishing a quiz

15

book about the show), Twin Peaks Prods., Inc. v. Publications Int'l, Ltd., 996 F.2d 1366 (2d Cir. 1993) ("Twin Peaks") (where defendants infringed on plaintiffs' copyright in a TV show by publishing a guide about the show), Star Trek (where defendants infringed on plaintiffs' copyright in a movie by publishing a guide about the movie), and Warner Bros. Entm't Inc. v. RDR Books, 575 F. Supp. 2d 513 (S.D.N.Y. 2008)("Harry Potter")(where defendants infringed on plaintiffs' copyright in books and movies by publishing an encyclopedia based on them).

By any reasonable comparison, defendants' Guides copy substantial aspects of the themes, characters, plots, sequencing, pace, and settings of plaintiffs' Novels. Indeed, that is their stated purpose. Def. 56.1 St. ¶¶ 68, 76 (admitting that "defendants 'wanted to be true to the author's original conception'" at least "as far as possible given the nature of the KinderGuides as children's books" and that defendants' works seek to convey to children "the stories and characters" in plaintiffs' Novels). Defendants thus effectively admit to copyright infringement as a matter of law.

(4)   Derivative Works

Plaintiffs also allege that defendants' Guides violate their right to control the preparation of derivative works. See 17 U.S.C. § 106(2). The Copyright Act defines a "derivative work" as: "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture

16

version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101. "A work is not derivative, however, simply because it is 'based upon' the preexisting works." Harry Potter, 575 F. Supp. 2d at 538. Only works that are "recast, transformed, or adapted" into another medium, mode, or language while still representing the "original work of authorship" are derivative. Id.; Castle Rock, 150 F.3d at 143 n. 9. For example, book reviews and parodies of copyrighted works are not derivative works, despite being based on, and potentially reproducing, substantial amounts of protected expression. See Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 592 (1994) (stating the general rule that the "market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop").

Depending on its nature, a "guide" may or may not qualify as a derivative work. The issue turns on whether the guide changes the copyrighted material in such a way that the guide no longer represents the original "work of authorship." 17 U.S.C. § 101; Warner Bros. Entm't Inc. v. RDR Books, 575 F. Supp. 2d 513, 539 (S.D.N.Y. 2008). For example, the Second Circuit found that a guide to the TV show Twin Peaks, which "merely transformed" the original work "from one medium to another," was a derivative work. But an encyclopedia based on the Harry Potter world, which did not tell the same story as the original copyrighted books and movies, was not a

17

derivative work. Id. ("by condensing, synthesizing, and reorganizing
the preexisting material in an A-to-Z reference guide, the Lexicon
does not recast the material in another medium to retell the story
of Harry Potter, but instead gives the copyrighted material another
purpose. That purpose is to give the reader a ready understanding of
individual elements in the elaborate world of Harry Potter that
appear in voluminous and diverse sources.").

      Here, though defendants' Guides add additional material at the
end, specifically a few brief pages of "Analysis," "Quiz Questions,"
and information about the author, they are primarily dedicated to
retelling plaintiffs' stories. Two pages of analysis do not convert
the Guides overall - which are largely composed of "Story Summaries"
- into something that no longer "represents the original work of
authorship." Like a translation, dramatization, or motion picture
adaptation (three categories explicitly delineated by Congress as
derivative works, see 17 U.S.C. § 101), and like the guide in Twin
Peaks, defendants' works basically retell the story of plaintiffs'
works in another medium (in this case illustrated children's books).
Thus, because defendants never received permission from plaintiffs
to produce their Guides, the Guides are unauthorized derivatives as
a matter of law. See Def. 56.1 St. ¶ 150.

      For the aforementioned reasons, defendants' Guides are
infringing; they infringe upon plaintiffs' exclusive right to
reproduce their Novels, including the character of Holly Golightly
(a separate count), and they infringe upon plaintiffs' exclusive

18

right to exploit the market for derivative works based on their
Novels.

## B. Fair Use

Defendants argue that, even if they have infringed plaintiffs'
Novels, defendants' Guides are protected by the doctrine of fair
use. Fair use is an affirmative defense to infringement,
traditionally defined as "a privilege in others than the owner of
the copyright to use the copyrighted material in a reasonable manner
without his consent." Harper & Row, 471 U.S. at 549 (quoting H.
Ball, Law of Copyright and Literary Property at 260 (1944)). Though
"fair use is a mixed question of law and fact," Id. at 560, where a
court finds no genuine issues of material fact it may conclude as a
matter of law that a challenged use does not qualify for fair use
protection. See Wright v. Warner Books, Inc., 953 F.2d 731, 735 (2d
Cir. 1991) (noting that the "mere fact that a determination of the
fair use question requires an examination of the specific facts of
each case does not necessarily mean that in each case involving fair
use there are factual issues to be tried") (internal citations
omitted).

The Copyright Act specifies four non-exclusive factors that
bear on fair use: (1) the purpose and character of the use,
including whether such use is of a commercial nature or is for
nonprofit educational purposes; (2) the nature of the copyrighted
work; (3) the amount and substantiality of the portion used in

relation to the copyrighted work as a whole; and (4) the effect of
the use upon the potential market for or value of the copyrighted
work. 17 U.S.C. § 107.

These factors are not meant to be "treated in isolation" — they
are designed to be "weighed together," and applied with the
underlying constitutional purposes of copyright in mind. Campbell,
510 U.S. at 578. Indeed, "[f]rom the infancy of copyright protection
some opportunity for fair use of copyrighted materials has been
thought necessary to fulfill copyright's very purpose, '[t]o promote
the Progress of Science and useful Arts'" Id. at 575 (quoting U.S.
Const., Art. I, § 8, cl. 8).

The doctrine of fair use furthers these goals by permitting
others to use existing works in ways that their owners would not
ordinarily use them. For example, criticism and commentary are
protected by fair use because we do not expect the "creators of
imaginative works" to "license critical reviews" of their own
productions. "People ask ... for criticism, but they only want
praise." Campbell, 510 U.S. at 592 (quoting S. Maugham, Of Human
Bondage at 241 (Penguin ed. 1992)). Indeed, academic freedom and
robust critical debate require that Congress allow people to analyze
fiction without first seeking approval from publishing houses or
authors. The same principles and protections extend to parodies,
which we would not expect copyright holders to willingly license,
but, which nonetheless benefit the public. Id.

What fair use law does not protect is the right of others to produce works that, generally speaking, the "creators of imaginative works" might choose to produce themselves. Congress granted the exclusive right to produce (or license) such derivatives and other substantially similar works to copyright holders, regardless of whether, in any given instance, the copyright holders intend to use these rights or not. The central question presented in this case, then, is whether illustrated children's guides to adult novels are the sort of use that Congress reserved to copyright holders or the sort of use, like criticism or parody, which Congress intended to allow others to exploit.

(1)  Purpose and Character of the Use

The first factor in a fair use inquiry is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). A work that adds "further purpose or different character, altering the first with new expression, meaning or message," is often described in the case law as "transformative." Campbell, 510 U.S. at 579 (citing Pierre N. Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. 1105 (1990) ("Leval") (coining the term "transformative")).[3] Transformation, in this sense, has a particular meaning. As Judge Leval explains it, a work is transformative if it

---

[3] Whether a work is transformative is a separate question from whether it is commercial in nature, a question which is not dispositive but tends to favor copyright holders on the margins. See Twin Peaks, 996 F.2d at 1375.

is "productive"; if it adds "new insights and understandings" for the "enrichment of society." Transformative uses of a copyright work may include, for example, "criticizing the quoted work, exposing the character of the original author, proving a fact, or summarizing an idea argued in the original in order to defend or rebut it." Leval at 1111.

Here defendants' argue that their Guides are potentially transformative in three respects: (1) they abridge plaintiffs' Novels by substantially shortening them; (2) they modify plaintiffs' Novels for a younger audience by removing adult themes; and (3) they add to plaintiffs' Novels by adding a page or two of analysis, two pages of quiz questions, and a few pages of background information.

None of these alterations are sufficient to sustain defendants' fair use claim. As an initial matter, U.S. law no longer protects abridgements as fair use, even in cases where the shortening involves, as Justice Story put it, "real, substantial condensation of the materials, and intellectual labor and judgment bestowed thereon; and not merely the facile use of the scissors." Folsom v. Marsh, 9 F.Cas. 342, 344-45 (C.C.D. Mass. 1841). Instead, under the Copyright Act, abridgements are generally considered to be derivative works, and the right to prepare them is reserved exclusively to the copyright holder. See Twin Peaks, 996 F.2d at 1376.

With respect to modifying the Novels for a younger audience, the mere removal of adult themes does not meaningfully "recast" the

work any more than an airline's editing of R-rated films so that
they can be shown to children on a flight absolve the airline from
paying a royalty. As Judge Leval puts it, the question is whether
the work produces new insights and understandings. Here, defendants'
expurgated Guides are a vehicle for conveying to children the
Novels' original stories and insights. Indeed, it is quite clear
that defendants' Guides seek to fairly represent the original work
of authorship – defendants admit as much. See Def. 56.1 St. ¶¶ 76,
78.

Finally, there is the question of whether defendants' Guides
qualify as educational criticism or commentary. Works of criticism
and commentary provide the sort of new insights and understandings
that are the sine qua non of transformative use. Defendants suggest
that their Guides should be considered commentary, arguing that
their works serve educational purposes. As evidence, defendants
point to the few pages of analysis, quiz questions, and background
information at the back of each Guide. Def. Mem. at 21.

But tacking on these few pages does not provide safe harbor for
an otherwise infringing work. The law is clear that, to be
considered transformative criticism, the aspects of a work that
reproduce another's protected expression must be in service of
commentary on that work. Indeed, it is not enough for part of a work
to have a transformative purpose. Courts must also consider whether
the work "does so [i.e. transforms] to an insignificant or a
substantial extent." Twin Peaks, 996 F.2d at 1374. In other words,

if a defendant's work describes the plot of a copyrighted work "briefly" in order to add significant comment about the authors' plotting technique, then it may be protected by fair use. But if a defendant copies more than is necessary to facilitate "comment or criticism," then it will not be protected. Id. at 1374-5.

Here, defendants' story summaries do not recount plaintiffs' Novels in the service of literary analysis, they provide literary analysis in the service of trying to make the Guides qualify for the fair use exception. Indeed, defendants admitted this in open court, when their counsel explained that Colting and Medina "went to great lengths" to achieve fair use protection. See Transcript, ECF No. 48 at 17 ("the very fact that we have these sections in the book [e.g. the "Main Characters" and "Keywords" and "Analysis" sections] . . . these are all things that were done to make these books fair use, at least in the minds of the defendants"). Fair use, however, is not a jacket to be worn over an otherwise infringing outfit. One cannot add a bit of commentary to convert an unauthorized derivative work into a protectable publication.

Thus, defendants' Guides do not transform plaintiffs' Novels in a legally cognizable way. For this reason, and because defendants' Guides are of a commercial nature, the first factor strongly favors plaintiffs.

(2)  Nature of the Copyrighted Work

The second factor in a fair use inquiry regards the nature of the copyrighted work. 17 U.S.C. § 107(2).  Copyright law recognize,

24

in order to promote the sciences and the arts, the "application of the fair use defense" must be broader "in the case of factual works than in the case of fiction or fantasy." 3 Nimmer § 13.05[A] at 13-77. In other words, expressly creative works tend to receive more robust copyright protection than news broadcasts or non-fiction publications. See Stewart v. Abend, 495 U.S. 207, 237-8 (1990). In this case, plaintiffs' Novels are precisely the sorts of creative works that receive special solicitude in a fair use analysis. See Twin Peaks, 996 F.2d at 1376. Thus, the second factor favors plaintiffs.

    (3)  Amount and Substantiality of the Use

    The third factor — the amount and substantiality of the portion of the copyright work used — must be examined in context. Castle Rock, 150 F.3d at 144; Campbell, 510 U.S. at 586-7. This is not, as defendants conceive of it, a question of bare percentages. Def. Mem. at 22. Instead, it turns on whether the "extent" of the copying is consistent with, or more than necessary to further "the purpose and character of the use." Campbell, 510 U.S. at 586-7; Castle Rock, 150 F.3d at 144. In cases of parody, journalism, and criticism, fair use doctrine allows for more of a copyrighted work to be copied than where the purpose is less transformative.

    Therefore, the question here is whether and to what extent defendants' copying was necessary to serve some transformative purpose - such as to provide commentary or criticism. The answer is clear: nearly all of defendants Guides' are devoted to telling

plaintiffs' copyrighted stories, with only two pages purporting to analyze them. Thus, the third factor favors plaintiffs. See, e.g., Star Trek, 11 F. Supp. 2d at 336 (noting that it is "difficult to see how 168 pages can be devoted to illustration while the true purposes of the book is [sic] carried out by the book's remaining 49 pages" of commentary).

(4)   Effect of the Use Upon the Potential Market

The fourth factor is the "effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). Under current law, plaintiffs need not show that their Novels have suffered an actual drop in sales. To negate fair use one need only show that if the challenged use "should become widespread, it would adversely affect the potential market for the copyrighted work." Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. at 451 (1984). And, "because the licensing of derivatives is an important economic incentive to the creation of originals," this analysis must consider not only the effect of defendants' Guides upon the market for plaintiffs' original copyrighted works, but also the effect of the Guides upon the market for potential derivative works. Campbell, 510 U.S. at 593.

Defendants make two arguments in support of their contention that the fourth factor weighs in their favor. First, they argue that their Guides do not affect the market for plaintiffs' Novels. "To pretend that any consumer would go to a bookstore (electronic or otherwise) seeking one of the great classics of American literature

and instead choose to purchase an illustrated children's book defies belief." Def. Mem. at 23. But it is defendants' burden to show that their works will not adversely affect either the market for plaintiffs' originals or the market for derivative works based on plaintiffs' originals. Both sides agree that there is an established market for children's versions of adult novels, and that publishers, like plaintiffs, often choose to license their works to exploit that market. Def. 56.1 St. ¶¶ 95, 145. Indeed, plaintiffs provide many examples for the record of publishers exploiting this market in this way. Id. ¶ 96.

Second, defendants argue that "Plaintiffs' have never created, marketed, or licensed any work that remotely resembles Defendants' works." Def. Mem. at 24. Even if this were true,[4] it would not be enough for defendants to show that plaintiffs have not exploited a derivative market. It suffices, as a matter of law, that plaintiffs might change their minds. Castle Rock, 150 F.3d at 146. "If the defendant's work adversely affects the value of any of the rights in the copyrighted work (in this case the adaptation [and serialization] right) the use is not fair." Harper & Row Publishers, 471 U.S. at 568 (quoting 3 Nimmer § 13.05[B], at 13-77—13-78 (footnote omitted)) (brackets in original). Thus, as children's books "fill a market niche" that plaintiffs "would in general

---

[4] As discussed earlier, it is undisputed that plaintiffs have published an ESL version of 2001: A Space Odyssey, which competes in the same ESL market as defendants' Guide. Def. 56.1 St. ¶¶ 114, 142.

develop or license others to develop," the fourth factor favors the plaintiffs. Castle Rock, 150 F.3d at 145 (emphasis added).

(5)   Other Considerations

The Court must also take into consideration other factors that might bear on the question of fair use. Campbell, 510 U.S. at 577. Among these is whether, as defendants argue, their works should be protected because otherwise the constitutional purpose of copyright law - to promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries - would be frustrated. U.S. Const., Art. 1, § 8, cl. 8. As defendants' point out, copyright law is designed to "motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired." Harper & Row Publishers, 471 U.S. at 546 (quoting Sony Corp. of America, 464 U.S. at 429). This "monopoly created by copyright . . . rewards the individual author in order to benefit the public." Id.

Thus, defendants ask the Court to assess the interests of the public in the context of the facts of this specific case. Plaintiffs "do not include authors, but the heirs, trusts and estates of authors." Def. Mem. at 1. Plaintiffs have not published illustrated children's books based on their Novels and appear to have no intention of doing so. Thus, according to defendants, plaintiffs "explicitly seek to stifle the creation of" new works, and their

28

"sole interest" in this case "is not to preserve their own works, or their ability to license their works, but instead to prevent the creation of wholly new works that reference their own." Id. at 1, 24. Plaintiffs' motives, they contend, do "not satisfy the constitutional imperative that the limited monopoly granted to authors be exercised in such a way as to "promote the progress of science and the useful arts." Def. Mem. at 24.

However, the Court cannot apply one fair use analysis where copyright holders can show they plan to exploit their rights to make derivative works and another fair use analysis in a case where copyright holders have not exploited such rights for half a century or longer or disclaim any intention of exploiting them in the future. Such an approach would be inconsistent with the Copyright Act. Congress did not provide a use-it-or-lose-it mechanism for copyright protection. Instead, Congress granted a package of rights to copyright holders, including the exclusive right to exploit derivative works, regardless of whether copyright holders ever intend to exploit those rights. Indeed, the fact that any given author has decided not to exploit certain rights does not mean that others gain the right to exploit them. "It would . . . not serve the ends of the Copyright Act — i.e., to advance the arts — if artists were denied their monopoly over derivative versions of their creative works merely because they made the artistic decision not to saturate those markets with variations of their original." Castle

Rock Entm't v. Carol Pub. Grp., Inc., 955 F. Supp. 260, 272 (S.D.N.Y. 1997), aff'd sub nom. Castle Rock, 150 F.3d 132.

Implicit in defendants' argument, then, is a contention that the Copyright Act itself is unconstitutional. As defendants put it, "the original copyright act granted authors exclusive rights for a 14-year term, with the option for a renewal term of the same length. Over the course of the following 200+ years, the grant of rights has expanded unchecked, leading us here today." Def. Mem. at 1. Defendants are no doubt correct in pointing out that Congress' policy judgments have changed substantially over the course of our nation's history. But as a legal matter, for the Copyright Act to withstand constitutional scrutiny, it must merely be the case that, in constructing its general scheme, Congress had a rational basis to believe that granting a suite of exclusive derivative rights to copyright holders would advance progress in the sciences and the arts. See Eldred v. Ashcroft, 537 U.S. 186, 208 (2003) (finding that, if the Copyright Act is "a rational enactment," the Court is "not at liberty to second-guess congressional determinations and policy judgments . . . however debatable or arguably unwise they may be"). As defendants make no effort to show that Congress lacked such a rational basis for providing plaintiffs an exclusive right to exploit derivative works, including children's adaptations, this Court cannot provide defendants with the relief they are seeking.

In sum, given the clearly infringing nature of defendants' Guides, and the fact that that the Guides are unauthorized

derivative works that do not primarily critique or parody plaintiffs' Novels but rather reproduce, albeit in a different form, plaintiffs' "original work of authorship," no reasonable trier of fact could find for defendants in this case. The Court therefore, in its Order of July 28, 2017, granted summary judgment to the plaintiffs on all nine counts of infringement and rejected the affirmative defense of fair use as a matter of law.

The Clerk of the Court is hereby directed to close the motions at docket entry number 21, 22, and 27.


SO ORDERED.

Dated:   New York, NY
         September 7, 2017                    _____
                                              JED S. RAKOFF, U.S.D.J.